# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 23-2643

UNITED STATES OF AMERICA,
Appellee

v.

DAVID CURRAN
Appellant

---

BRIEF FOR APPELLANT

---

ON APPEAL FROM THE JUDGMENT ENTERED IN THE UNITED
STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA
2:19-CR-8

Michael Ovens, Esq.
PA ID No. 317994
The Law Office of Michael Ovens
220 Grant Street, Suite 302
Pittsburgh, PA 15219
P: 412-368-3445 // F: 412-219-5268
mike@ovenslaw.com
*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... 4

I.   STATEMENT OF JURISDICTION ................................................. 6

II.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW
     7

III. STATEMENT OF RELATED CASES .......................................... 7

IV.  STATEMENT OF THE STANDARD OR SCOPE OF REVIEW
     9

V.   CONCISE STATEMENT OF THE CASE ................................. 10
     A. Introduction ............................................................................ 10
     B. Procedural History ............................................................... 11
     C. Statement of Facts ............................................................... 15

VI.  SUMMARY OF THE ARGUMENT ........................................... 22

VII. ARGUMENT ............................................................................. 24
     A. Sufficiency ............................................................................ 24
          1. Agreement Generally ................................................... 25
          2. Shared Unity of Purpose ........................................... 26
          3. Intent to Achieve Common Illegal Goal ................ 28
     4. Agreement to reach that shared goal ...................... 32
          5. Conclusion .................................................................... 33

     B. Chain of Custody .............................................................. 34

     C. Closing Issue ...................................................................... 44
          1. Errors by the Prosecutor .......................................... 47
          2. The ameliorative effect of any curative instructions given
             54
          3. The strength of the evidence supporting conviction ...... 57

**VIII.  CONCLUSION** ................................................................. **60**

**CERTIFICATE OF ADMISSION, IDENTICAL TEXT, VIRUS CHECK**................................................................ **61**

**CERTIFICATE OF COMPLIANCE** .................................................. **62**

**CERTIFICATE OF SERVICE**........................................................... **63**

# TABLE OF AUTHORITIES

## Cases

*Darden v. Washington*, 477 U.S. 168 (1986) ........................................... 44

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ..................................... 44

*Government of Virgin Islands v. Toto*, 529 F.2d 278 (3d Cir. 1976) ...... 44

*Johnson v. United States*, 520 U.S. 461 (1997) ......................................... 9

*Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001) .................................... 31

*Smith v. Phillips*, 455 U.S. 209 (1982) ..................................................... 57

*State v. Rader*, 124 P. 195 (Oregon 1912) ............................................... 55

*United States v. Bailey*, 840 F.3d 99 (3d Cir. 2016) ................... 22, 26, 27

*United States v. Brown*, 702 F.3d 1060 (8th Cir. 2013) ............................ 9

*United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2004) ...... 22

*United States v. Coyle*, 63 F.3d 1239 (3d Cir. 1995) ................................. 8

*United States v. Deckle*, 165 F.3d 826 (11th Cir. 1999) .................... 27, 28

*United States v. DeLarosa*, 450 F.2d 1057 (3d Cir. 1971) ...................... 33

*United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999) ............................... 26

*United States v. Gore,* 154 F.3d 34 (2d Cir. 1998) .................................. 23

*United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991) .................. 33

*United States v. Hasting*, 461 U.S. 499 (1983) ....................................... 43

*United States v. Iafelice,* 978 F.2d 92 (3d Cir. 1992) .............................. 31

*United States v. Jackson*, 649 F.2d 967 (3d Cir. 1981) ............................. 8

*United States v. Jannotti*, 729 F.2d 213 (3d Cir. 1984). ......................... 44

*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013) .............................. 24

*United States v. Korey*, 472 F.3d 89 (3d Cir. 2007) ................................. 24

*United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993) ......................... 27

*United States v. Liburd*, 607 F.3d 339 (3d Cir. 2010) ............................... 9

*United States v. Luna*, 585 F.2d 1 (1st Cir. 1978) ..................................... 8

*United States v. Mancillas*, 580 F.2d 1301 (7th Cir. 1978) .................... 27

*United States v. McKee*, 506 F.3d 225 (3d Cir. 2007) ............................... 8

*United States v. Mejia*, 597 F.3d 1329 (D.C.Cir. 2010) .......................... 33

*United States v. Peppers*, 302 F.3d 120 (3d Cir. 2002) ............................. 8

*United States v. Pirani*, 406 F.3d 543 (8th Cir. 2005) .............................. 9

*United States v. Thomas*, 284 F.3d 746 (7th Cir. 2002) ......................... 27

*United States v. Watson*, 171 F.3d 695 (D.C.Cir. 1999) .......................... 43

*United States v. Wilson*, 565 F.3d 1059, 1066 (8th Cir. 2009) .............. 33

*United States v. Young*, 470 U.S. 1 (1985) ....................................... 43, 45

*United States v. Zehrbach*, 47 F.3d 1252 (3d. Cir 1995) ................... 44, 45

## Statutes

18 U.S.C. § 3231 ........................................................................... 4

18 U.S.C. § 3742 ........................................................................... 4

28 U.S.C. § 1291 ........................................................................... 4

## Other Authorities

*Developments in the Law-Criminal Conspiracy*, 72 Harv.L.Rev. 920
   (1959)............................................................................... 22

# I.   <u>STATEMENT OF JURISDICTION</u>

The United States District Court for the Western District of Pennsylvania had subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231, which states, in pertinent part, that "[t]he districts of the United States shall have original jurisdiction . . . of all offenses against the law of the United States." Judgment against Mr. Curran was filed on August 29, 2023. A timely notice of appeal was filed on September 7, 2023. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

A. Whether the evidence adduced at trial by the government was sufficient to prove Mr. Curran's guilt for conspiracy to distribute and possess with intent to distribute a controlled substance;

B. Whether Mr. Curran's due process rights violated and he was therefore denied a fair trial by the introduction of evidence for which no witness could establish its authenticity and for which no evidence or testimony established chain of custody for the crucial time period when the evidence was discovered until it was stored;

C. Whether Mr. Curran's due process rights were violated and whether he was denied a fair trial by the improper statements made by the prosecutor in her initial closing argument, necessitating a cautionary instruction to the jury, which she then repeated during rebuttal argument.

## III. STATEMENT OF RELATED CASES

Mr. Curran was charged along with forty-seven other defendants at 2:19-cr-8 under the caption *United States v. Noah Landfried*. All told, nine defendants proceeded to trial in three different groups. Group A

included Noah Landfried, Anthony Smith, and Michel Cercone. Group B included Omari Patton and Dashawn Burley. Group C included Mr. Curran and Ross Landfried.

Appeals are pending now for all three defendants in Group A – Noah Landfried at 23-1497, Anthony Smith at 22-2799 and 22-2844[1], and Michel Cercone at 22-3113. All of those cases have been consolidated for disposition.

Both defendants in Group B were acquitted and therefore no appeals were taken.

The appeal for Ross Landfried is docketed at 23-2816. By clerk's order of October 4, 2023, the appeals of Ross Landfried and David Curran are consolidated for purposes of disposition only. At the time of this filing, Ross Landfried's appeal does not yet have a briefing notice issued or a time for the opening brief to be filed. Counsel for Mr. Curran has conferred with counsel for Ross Landfried regarding the issues to be raised to avoid repetition between the briefs. The issues presented in this brief relate only to Mr. Curran's appeal.

---

[1] Anthony Smith was sentenced on a supervised release violation at the same time sentence was imposed for 2:19-cr-8.

## IV. STATEMENT OF THE STANDARD OR SCOPE OF REVIEW

In evaluating a challenge to the sufficiency of the evidence, this Court must review the evidence in the light most favorable to the government and is not to reweigh the evidence or make its own assessment as to witness credibility. *United States v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (citing *United States v. Peppers*, 302 F.3d 120, 126 (3d Cir. 2002)). The verdict will be sustained "if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995). As Mr. Curran filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, clear error review is not appropriate.

A trial court's ruling on whether there has been sufficient testimony to warrant reception of certain items into evidence is reviewed under an abuse of discretion standard. *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981). Furthermore, there is a presumption of regularity in the handling of exhibits by public officials, and the trial court is entitled to rely on that presumption. *Id.* at 973-74 (citing to *United States v. Luna*, 585 F.2d 1, 6 (1st Cir. 1978)).

This court's scope of review of claims of prosecutorial misconduct is plenary. *United States v. Liburd*, 607 F.3d 339, 342 (3d Cir. 2010). When a mistrial is requested, the denial is reviewed under an abuse of discretion standard. *Id.* Under the plain error standard, relief may only be granted if there is (1) an error, (2) that is plain, and (3) that affects a defendant's substantial rights. *United States v. Brown*, 702 F.3d 1060, 1065 (8th Cir. 2013) (reviewing contention that prosecutor made improper comment during closing argument when no objection made until arguments completed and jury dismissed to deliberate). Discretion to correct plain error should only be exercised if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

## V.    CONCISE STATEMENT OF THE CASE

### A. Introduction

The government indicted Mr. Curran alongside forty-seven other individuals, asserting a drug conspiracy that in part ran from Pittsburgh through manufacturing and distribution by Noah Landfried and reached out to a number of federal correctional facilities. The Federal

Correctional Institution, McDowell (FCI – McDowell), the facility housing David Curran, was one of those facilities. To prove this at trial, the government presented evidence which it argued circumstantially proved its case. It also offered the testimony of cooperating witnesses. However, the evidence presented fell short of that necessary to meet its burden of proof beyond a reasonable doubt. The government's proof also included evidence which should not have been introduced. Lastly, the government's closing argument included improper comments which completely misstated the evidence and essentially created a smoking gun out of thin air. Mr. Curran's judgment should be vacated entirely, and Mr. Curran discharged. In the alternative, the judgment should be vacated and a new trial granted for Mr. Curran.

## B. <u>Procedural History</u>

On June 18, 2019, David Curran was charged alongside forty-seven other individuals in a count of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of title 21, United States Code, Section 846. 2:19-cr-8 ECF 501. A bill of particulars was filed by Mr. Curran's co-defendants at ECF 1362 and 1370, which Mr. Curran joined on November 24, 2019. ECF 1423. Following oral

argument on January 17, 2020, the court issued an order denying the motion and a memorandum opinion for that decision on February 14, 2020. ECF 1614 and 1613 respectively.

Following additional pretrial litigation not relevant to issues raised in this appeal, delays necessitated by the COVID 19 emergency, and the separate trial groups, trial was scheduled for Mr. Curran and his co-defendant Ross Landfried for June 6, 2022. ECF 3252. *Motions in limine* and briefs in support were filed on May 5, 2022 and May 6, 2022. Pertinent to this appeal, Mr. Curran raised a pretrial objection to one of the government's proposed exhibits, a piece of mail intercepted at FCI – McDowell. ECF 3431 and 3432. The government responded to that objection (as well as others) on May 12, 2022. ECF 3455. The court denied the objection by Mr. Curran by Memorandum Order on May 26, 2022. ECF 3484.

Trial proceeded on June 6, 2022 and concluded on June 14, 2022, with the jury returning a verdict of guilty as to Mr. Curran. Mr. Curran moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and filed a brief in support on June 28, 2022. ECF 3551 and 3552. In that motion, Mr. Curran requested leave to supplement once

trial transcripts were completed. That request was granted. ECF 3556. A supplemental brief was filed on July 29, 2022. ECF 3584. The government filed a response on August 19, 2022, ECF 3610, and Mr. Curran filed a reply on August 26, 2022. ECF 3623. The court denied the motion on September 8, 2022, by way of memorandum order[2]. ECF 3649.

A tentative presentence report was disclosed to the parties on August 10, 2022, which included a proposed guideline range of 63-78 months based on a total offense level of 22 and a criminal history of IV. Mr. Curran objected to the presentence report on September 6, 2022. ECF 3638. An evidentiary hearing regarding those objections was held on April 11, 2023. ECF 3797. The government filed a brief in support of its position, as well as a joint sentencing memorandum for Mr. Curran and Ross Landfried, on May 18, 2023. ECF 3829. In that filing, the government agreed with Mr. Curran's argument as to criminal history points, and stated that his criminal history category should have been III, with a corresponding guideline range of 51-63 months, as opposed to what was originally determined by the probation office. *Id.* Mr. Curran

---

[2] That memorandum order also disposed of motions for judgment of acquittal filed by Ross Landfried, as well as a motion for a new trial filed by Ross Landfried pursuant to Federal Rule of Criminal Procedure 33.

filed his brief in support of guideline objections and response to the government's brief on June 2, 2023. ECF 3832. The government filed its reply brief on June 7, 2023. ECF 3834. The court issued an order sustaining in part and overruling in part Mr. Curran's guideline objections. ECF 3854 (opinion on presentence report objections) and 3855 (order). As a result, Mr. Curran's sentencing computation resulted in a total offense level of 18 and a criminal history category of III, for a guideline range of 33 to 41 months of imprisonment.

Sentencing was scheduled for August 29, 2023. The court imposed a term of imprisonment of 36 months, to be served consecutively to the sentence Mr. Curran was already serving at 2:09-cr-325. Mr. Curran was also ordered to serve a six-year term of supervised release which would run concurrently with the supervised release at 2:09-cr-325 and would include the same conditions as that previously imposed supervised release.

Mr. Curran filed his notice of appeal on September 7, 2023. ECF 3875. After production of transcripts and the issuing of a briefing schedule, and requests for additional time to file his brief and joint

appendix made on January 16, 2024 and January 30, 2024, Mr. Curran files this opening brief.

## C. <u>Statement of Facts</u>

In 2017, Detective Eric Harpster, a task force officer with the Drug Enforcement Agency, was investigating K2 distribution with a focus on distribution in prisons. K2 is an umbrella term that refers to chemicals intended to cause a cannabinoid result, with the chemical in question either controlled or uncontrolled by the DEA. Notes of Testimony ("NT") 6/7/22 at 85:2-8[3]. K2 is manufactured by dissolving chemicals in acetone and then dipping paper in that solution or spraying that solution on paper. *Id.* at 68:2-8. The chemicals would be put on thicker stock paper, on greeting cards, and on the pages of books. *Id.* at 68:9-15. It is easier to disguise the K2 laced paper if the paper involved was a heavier stock. *Id.*

K2 paper would be disguised as legal mail and greeting cards or sprayed onto pages of books and then mailed into prisons. *Id.* at 72:11-14. Once the paper was introduced into a prison, it would be cut into ID card sized pieces and then possibly smaller pieces as it was sold and

---

[3] The citations to the notes of testimony are by day of testimony and followed by the page number and line numbers in the following format – page**:**line.

resold. *Id.* at 70:13-19. Generally, those people who purchased ID card sized pieces of K2 were dealers themselves. *Id.* at 123-24:25-7. Individuals would pay for the K2 by using BP-199 checks (treasury checks issued from inmate accounts), by paying with their commissary account, or by paying with postage stamps. *Id.* at 74-75:17-5. Payments would also be made outside the facility, termed "street-to-street transactions." *Id.* at 75-76:16-1. These would be through Western Union, Cash App, or some other payment system. *Id.* at 75-76:21-1.

Users would spark the paper with battery wires or eat the paper to get high. *Id.* at 70:16-18. The effects of using or ingesting the K2 could be extreme – violence, projectile vomiting, inmates stripping naked, heart attacks and strokes were all examples provided by Harpster. *Id.* at 73-74:24-7. That caused a serious problem in prison settings, resulting in lock downs and other institutional issues. *Id.* at 74:8-16.

Nicholas Green was cellmates with Mr. Curran for a few months in 2017 and 2018. *Id.* at 140:12-14. He was also on the same housing unit as Mr. Curran for nearly a year. *Id.* Mr. Curran introduced himself to Green as "Pitt", but Green also heard other individuals refer to Mr. Curran as "Big Bird." *Id.* at 141:1-3. Green purchased K2 from many

individuals, however the majority of his purchases were from Mr. Curran. *Id.* at 145-46:21-4. Green saw Mr. Curran use K2. *Id.* at 147:20-23. Mr. Curran and Green's cell was searched multiple times, as they were considered heavy users. *Id.* at 158:5-7.

Other people would purchase K2 from Mr. Curran, sometimes because Green would bring those individuals to purchase K2 from Mr. Curran. *Id.* at 146:5-7 and 146-47:23-5. Green believed that Mr. Curran was receiving the K2 from someone Mr. Curran called "Slick" whom Green eventually learned was named Noah. *Id.* 149-50:21-5. Green learned this information after knowing Mr. Curran for a while, after Mr. Curran opened up to Green. *Id.* at 149:14-20.

Green believed Mr. Curran would know the contents of a package would include K2 based on some writing on the outside of the envelope. *Id.* at 150:6-16. However, Green also saw Mr. Curran think a mailing would have K2 when it did not, based on Mr. Curran trying to smoke small pieces of it. *Id.* at 150:17-25. That led to Mr. Curran getting K2 paper from someone else at the institution. *Id.* at 151:9-17. Green would also purchase K2 from other individuals. *Id.* at 158:22-25. At one point, Green sent another individual in the prison $3000 for K2. *Id.* at 176-

77:20-2. That money was for a purchase made by Green but facilitated by Mr. Curran. *Id.* In the whole time Green was on the same unit as Mr. Curran, a time period of about a year, *Id.* at 140:15-20, Green saw Mr. Curran with "upwards of maybe ten or better" sheets of K2. 151:18-24.

It was Green's understanding that Mr. Curran would not pay in advance for the K2, but that it would be fronted to him. *Id.* at 154:10-17. Green would purchase ID card sized pieces of the paper. *Id.* at 152:5-6. Payment would be made by buying commissary directly, trading food which equated to the value of the K2, sending money to individuals outside the facility, or having someone outside the facility put money on another individual's inmate account, amongst other ways. *Id.* at 152-53:21-5.

Detective Robert Chamberlain, detective with the Beaver County District Attorney's Office, testified as to the execution of a search warrant at 650 Beaver Road, a multiunit apartment building in Ambridge, Pennsylvania. The search warrant was executed on November 21, 2017. NT 6/7/22 at 207:2-7. The building was owned by the Landfried family. *Id.* at 208:1-2. The investigation centered on an individual named Larry Benavides, and the portion of the building he was renting. *Id.* at 207-

08:21-2. In a spare bedroom, items associated with K2 production were found. *Id.* at 211:6-13. Benavides was detained while the search was ongoing and a pill bottle with pieces of K2 paper inside was found on his person. *Id.* at 232:15-23. Additionally, he had another piece of K2 paper he was intending to sell. NT 6/8/22 at 8:20-22. The only other paper with controlled substances on it found during the search was found in an envelope next to Benavides's night stand. *Id.* at 9:1-7.

Two Bureau of Prison employees were called to discuss mailing procedures at United States Penitentiary – Lee and Federal Correctional Institute – McDowell: Michael Blevins and Richard Randall, respectively. As it pertains to one of the particular claims on appeal, a further discussion of their testimony appears below. Randall testified to the interception of Exhibit 29, an envelope which the government argued contained K2 paper and established a connection between Mr. Curran and Noah Landfried.

As for the individuals involved in the drug conspiracy who were outside of correctional facilities, the government called James Perry and Joseph Evans to testify. James Perry was with Noah Landfried in 2017 often, and by 2018 was with him nearly every day. NT 6/8/22 at 229:12-

18. Perry would manufacture K2 with Noah Landfried in his garage, sometimes on his own and sometimes with Noah. *Id.* at 230-31:22-4. There was significant other drug trafficking in which Perry assisted Noah Landfried. *Id.* at 230:14-17. There were times when the two of them would take over $500,000 to New York. NT 6/9/22. at 6:13-20. Throughout his testimony, Perry never mentioned Mr. Curran's name once and testified that he did not know Mr. Curran. *Id.* at 9:16-20.

Similarly to Perry, Joseph Evans testified as an assistant in Noah Landfried's drug trafficking scheme. *Id.* at 21:9-17. Evans actually reduced the amount of time he spent with Noah Landfried at the request of the DEA. *Id.* at 12-15. However, Evans's only testimony about Mr. Curran was meeting him through Noah and Ross Landfried in the early 2000s. *Id.* at 31:12-17. He made no other mention of Mr. Curran.

Special Agent Matthew Truesdell of the Pennsylvania Office of General testified as to a search of James Perry's garage on January 10, 2019. NT 6/8/22 at 44-45:21-2. The search took place at 243 Maplewood Avenue. *Id.* at 44:22-25. A K2 manufacturing set up was found inside. *See generally* Truesdell direct examination. However, nothing was found during that search referencing Mr. Curran.

Raymond Fields, someone incarcerated with Mr. Curran after the indictment was filed, testified to things he overheard from Mr. Curran. *Id.* at 85:2-6. Prior to Fields's testimony the trial court provided a cautionary instruction directing the jury to consider his testimony in only a limited way. *Id.* at 79-81:16-4. All of Fields's testimony related to things that took place in the Allegheny County Jail and in 2021. *Id.* at 82:7-12. Fields had significant legal problems and a lengthy record of convictions. *See generally* Fields testimony. Fields testified that Mr. Curran was having K2 brought into the Allegheny County Jail. *Id.* at 86-87:24-3. He also said Mr. Curran talked about his federal case. *Id.* at 88:6-11. Fields also admitted to being convicted for trying to bring drugs into the Allegheny County Jail via legal mail in 2015. *Id.* at 92-93:22-5. Furthermore, Fields thought Mr. Curran was liar who talked to much, and Fields didn't believe things Mr. Curran told him. *Id.* at 100:6-9.

The government also called Jerrad Baker, a corrections officer at the Cambria County Jail, and the trial court again provided a cautionary instruction about how to receive his testimony. *Id.* at 112:12-15. Baker testified as to interactions he had with Mr. Curran in 2022, where Mr.

Curran asked Baker about bringing paper into the facility from people on the outside. *Id.* at 113:15-22 and 115:1-10.

The government also called Humberto Herrera and Kenneth Lawson as cooperating witnesses testifying against Ross Landfried. They called Agent Kevin Petrulak, IRS agent, to testify as to financial transactions related to the money laundering counts against Ross Landfried.

Lastly, the government recalled case agent Harpster to introduce some additional pieces of evidence. Of greatest relevance for this appeal were the recordings at Exhibit 5, and the transcripts of those recordings at Exhibit 6, as well as the full recordings introduced during the cross examination of agent Harpster. The government's case operated on inferences, and much of its argument centered around the words used and the tone of those phone calls.

## VI.  <u>SUMMARY OF THE ARGUMENT</u>

The evidence presented was insufficient to prove Mr. Curran conspired with anyone else to distribute or possess with the intent to distribute controlled substances. The circumstantial evidence presented was too diffuse to establish the crucial elements of a conspiracy

conviction. There was no evidence which would substantiate an agreement between Mr. Curran and others, notably Noah Landfried, as the government argued during trial. The evidence did not establish a unity of purpose between conspirators. Importantly, there was no intent to achieve a common goal established. The relationship between Mr. Curran and Noah Landfried, even as meager as the evidence was, could only show a buyer/seller relationship. There was no evidence to show that Mr. Curran intended to further the goals of the conspiracy as a whole. Mr. Curran's conviction should be vacated.

The trial court erred when it allowed the introduction of the FCI-McDowell mailing. While challenges to the authenticity of a piece of evidence are heavily scrutinized and seldom lead to relief, the circumstances in this case are concerning enough to warrant a new trial. The witness called to testify about the item had no first-hand knowledge of its state when it arrived in the facility and for over a. year. He was given a sealed envelope and put it in a locked filing cabinet and was not able to provide any other information about the discovery of the item. The presumption that regular procedures were followed does not apply in this case. There was no procedure followed. The evidence should have been

excluded. Its introduction had a significant impact on the verdict. Mr. Curran should be granted a new trial.

The prosecutor in her closing argument made improper comments completely misstating the evidence, and greatly prejudicing Mr. Curran. Cautionary instructions came too late, after the objection was initially overruled, resulting in an unfair trial for Mr. Curran. Mr. Curran should be granted a new trial.

## VII.  ARGUMENT

### A. Sufficiency

Reviewing the evidence carefully, it is clear that the government did not meet its burden. "Circumstantial inferences drawn from the evidence must bear a logical or convincing connection to established fact." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2004) (quotations omitted). It is important to keep clear distance must be traversed by inference from the evidence presented. The government is afforded reasonable inferences as the verdict winner, however the inferences cannot fill in all gaps. A conspiracy can be inferred "when evidence of related facts and circumstances make clear that the defendants could not have carried out their activities except as a result

of a preconceived scheme or common understanding." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (citations and quotations omitted). But, when an individual is merely in a buyer-seller relationship with a supplier, that will not suffice to establish a drug conspiracy. *Id.*

The elements of conspiracy are "(1) a shared unity of purposes; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal". *Id.* The government failed to establish a shared unity of purpose between Mr. Curran and any other individual. The government failed to establish an intent to achieve a *common* illegal goal. The government failed to establish an agreement between Mr. Curran and any other individual. The government did not establish the essential elements of a prosecution for conspiracy. His conviction must be vacated.

## 1. Agreement Generally

"[T]he act of agreeing is a group act[. ] Unless at least two people commit it, no one does." *Developments in the Law-Criminal Conspiracy*, 72 Harv.L.Rev. 920, 926 (1959) (cited in *United States v. Gore,* 154 F.3d 34, 40 (2d Cir. 1998)). As a general matter, no evidence was presented which suggested any kind of agreement between Noah Landfried and Mr. Curran. To support the verdict of guilty, inference must be heaped upon

inference to create a lengthy chain. Careful scrutiny "is exactly what is required in these unusual cases." *United States v. Jones*, 713 F.3d 336, 347 (7th Cir. 2013). Careful scrutiny means looking at "each inference in isolation, and then [going on] to evaluate the cumulative effect of the inferential chain." *Id.*

There was no direct evidence of an agreement. There was no direct evidence of contact between Mr. Curran and Noah Landfried, nor between Mr. Curran and the individuals which Noah Landfried saw on a near daily basis (James Perry and Joseph Evans). The evidence from which inferences could be made, essentially, is a mailing intercepted in August of 2017 about which no other testimony was introduced (such as the source or who mailed it), the testimony of Nicholas Green, and the phone calls introduced into evidence between Mr. Curran and his mother. But all of those together do not demonstrate an agreement. It only leads to an assumption that an agreement must have been in place in order for this to occur.

### 2. Shared Unity of Purpose

In order to establish a conspiracy, it must be shown that the alleged conspirators shared a unity of purpose. *United States v. Korey*, 472 F.3d

89, 93 (3d Cir. 2007). While a participant in a conspiracy might have a specific role, the overarching goal must be the same as the other members of the conspiracy. *Id.* at 95.

Any unity of purpose must be established through inferences made by the jury. The testimony only suggested transactions which would have established the movement of drugs in one direction, from Noah to Mr. Curran. There was no testimony about movement of money or anything else in the other direction, from Mr. Curran to Noah. Furthermore, a significant portion of the testimony was about drugs being seized (the FCI – McDowell mailing) and therefore a transaction *not* taking place, Mr. Curran thinking a particular mailing was drugs when it was *not*, and Mr. Curran finding another supplier. Green did not testify to the number of times Mr. Curran received these drugs from Noah Landfried, or how these transactions were done in any sort of consistent, regular manner. While there was vague testimony without any supporting evidence about payment made to Mr. Curran, there was no testimony at all about payment made to Noah Landfried, the purported center of this conspiracy. There was nothing presented to suggest what Mr. Curran

was doing and what Noah Landfried was doing was in any way part of the same enterprise, as opposed to two self-interested individuals.

Any suggestion that there was a unity of purpose would require the jury to speculate. The evidence presented could not support *inferences* sufficient to come to that conclusion. While a jury could have filled in certain gaps, too much would be required to establish this element. There was no unity of purpose established by the testimony.

### 3. Intent to Achieve Common Illegal Goal

"In drug conspiracy cases, the government must prove that the defendants were not merely engaged in 'buyer-seller' relationships with their suppliers." *Bailey*, 840 F.3d at 108. In determining whether a conspiracy, as opposed to a buyer-seller relationship, exists, courts have considered certain factors such as "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust." *United States v. Gibbs*, 190 F.3d 188, 199 (3d Cir. 1999). Additionally, whether the transactions involved large amounts of drugs and whether the drugs were purchased on credit should be examined. *Id.* It should be considered "whether the

buyer can be said to have a stake in the larger conspiracy beyond the buyer/seller relationship." *Bailey*, 840 F.3d at 108 (citing to *Gibbs*, 190 F.3d at 198 n.3) (cleaned up).

"What distinguishes a conspiracy from its substantive predicate offense is not just the presence of any agreement, but an agreement with the same joint criminal objective. This joint objective is missing where the conspiracy is based simply on an agreement between a buyer and a seller for the sale of drugs." *United States v. Deckle*, 165 F.3d 826, 829 (11th Cir. 1999). "What is needed for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the agreement itself." *United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993). "In the end, what we are looking for is evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture." *United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002). "The relationship of buyer and seller *absent any prior or contemporaneous understanding* beyond the mere sales agreement does not prove a conspiracy . . . In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective." *United States v. Mancillas*, 580 F.2d

1301, 1307 (7th Cir. 1978) (emphasis in original). Even with repeated transactions, "[i]f the evidence only shows a buy-sell relationship, the fact that the sales are repeated, without more, does not support an inference that the buyer and seller have the same joint criminal objective to distribute drugs." *Deckle*, at 830.

The testimony established the following: Green purchased synthetic cannabinoids from Mr. Curran; Green understood Noah Landfried to be the source of the synthetic cannabinoids Mr. Curran was selling; Mr. Curran himself consumed the drugs; Green and Mr. Curran were considered to be heavy users and had their cell searched because of it. While Green testified about how Mr. Curran received the drugs, there was no testimony about how Mr. Curran and Noah communicated about the transactions. There was no testimony about how Mr. Curran would pay for the drugs, much less whether there was a standardized or regularized method of payment. There was testimony about how *Mr. Curran* would be paid for the drugs, but nothing about how Mr. Curran directed money to Noah Landfried. Nothing about Green's testimony established a *common* objective between Noah Landfried and Mr. Curran.

There was no testimony at all about any prior or contemporaneous understanding, or any understanding at all between Mr. Curran and anyone else as to the mailing postmarked August 15, 2017. The phone number suggested to be related, 412-682-0732, was only added to Mr. Curran's inmate account *after* the mailing possibly arrived at FCI-McDowell. While records for that phone number showed calls to Mr. Curran's mother, they were few in number (a total of four) and occurred after the mailing was intercepted. While there was testimony about an individual named Dashawn Burley and his phone number appearing in those phone records, it was not established when or how often those calls were made. The phone number could have been associated with Noah Landfried, because Noah Landfried spoke to Dashawn Burley about K2 paper[4] but that was not established. Importantly, a record of a call does not establish the content of the call or even the person who made the call. Again, there is little here to support the inferences needed to support the verdict.

---

[4] The toll records only show that Dashawn Burley's phone number appears in the list of calls.

At least by April of 2018, it was clear that Mr. Curran could no longer get in touch with Noah (if he could have previously at all), as demonstrated by his phone call admitted in evidence by the government. There was no direct evidence at all showing the actual transaction of drugs, just testimony from Green about a general manner of doing so. In fact, nearly the entirety of the conspiracy rested on Green's testimony, which was vague and non-specific and spoke nothing of an actual *agreement* between Mr. Curran and anyone else to do anything at all. What the testimony of Green establishes is the transaction of drugs from one party, Noah, to another Mr. Curran.

## 4. Agreement to reach that shared goal

The 650 Beaver Road address added to Mr. Curran's inmate account does not provide actual evidence of an agreement. It is another possible launching pad for inferences. The mail was intercepted three months before the search warrant at 650 Beaver Road was executed, Mr. Curran's name was not found at the address where the search warrant was executed, and the mixture of substances found on the FCI-McDowell item and the items found at 650 Beaver Road were different.

The phone number at issue, 412-872-0362, again provides a possible basis for inferences, but, again, it is not itself definitive evidence of an *agreement*, of a *conspiracy*. Again and again, the evidentiary record is replete with this same situation. There was not sufficient evidence presented to establish the elements of a conspiracy.

### 5. Conclusion

"Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001). Many Third Circuit cases suggest a conspiracy can be proven by the government circumstantially establishing evidence grain-by-grain until the scale finally tips. *United States v. Iafelice,* 978 F.2d 92, 98 (3d Cir. 1992) (amongst others). In this case few grains were established, and none could be piled together to meet the high burden placed on the government, the burden the government must always carry – proof beyond a reasonable doubt to each element of the crime charged. Mr. Curran's conviction must be vacated.

## B. Chain of Custody

At trial, the government introduced Exhibit 29, a photograph of an envelope it argued had been mailed to Mr. Curran while he was incarcerated at FCI-McDowell. The testimony proffered by the government was not sufficient to establish the authenticity of that item. The evidence was not sufficient to establish the circumstances in which it was discovered, in which it was stored for over a year until it came into DEA custody, and what might have happened in between. The issues were serious enough to call into question that the item was what the government said it was. The exhibit should not have been introduced. Mr. Curran is entitled to a new trial where the introduction of this exhibit is prohibited.

Federal Rule of Evidence 901 sets forth the basic rule that the proponent of an item must first put forward evidence "sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(b)(1). Sometimes this requirement is met through a witness with direct knowledge identifying it. *Id.* Evidence can also be authenticated by showing a chain of custody. The chain of custody must show a reasonable probability that the evidence has not been

changed or altered. *United States v. Wilson*, 565 F.3d 1059, 1066 (8th Cir. 2009). This means the object must be shown to be in substantially the same condition as when it was seized. *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991). The mere possibility of a break in the chain of custody only goes to the weight of the evidence. *Harrington*, 923 F.2d at 1374. The burden to establish a chain of custody is not a heavy one. 5 Christopher B. Muller & Laird C. Kirkpatrick, *Federal Evidence* § 9:1 (3d ed. 2007). There is no need to establish a complete and exclusive chain of custody. *United States v. DeLarosa*, 450 F.2d 1057, 1068 (3d Cir. 1971). However, serious gaps may render a chain of custody so deficient that exclusion is required. *United States v. Mejia*, 597 F.3d 1329, 1336 (D.C.Cir. 2010).

At trial, vastly different testimony surrounded Exhibit 29 and Exhibit 10.2, the exhibit referred to as the Sterling Marshall mailing. These mailings were introduced as evidence against Mr. Curran and Ross Landfried respectively. However, as each defendant was housed in a different facility, different witnesses were called to introduce the exhibits. Michael Blevins, a special investigations services ("SIS") technician at United States Penitentiary Lee (USP-Lee), a federal prison

in Lee County, Virginia, testified as to the interception of Exhibit 10.2, its securing, and its eventual transfer to the Harpster and other DEA agents.

Blevins testified to his experience as a technician at USP-Lee. The facility received thousands of pieces of mail every day, which meant that while all legal mail would be scrutinized, personal mail would only be examined if something caught the eye of staff inspecting it. NT 6/8/22 at 86:7-14. At first, individuals would try to send K2 paper through personal mail. *Id.* at 86:2-3. Increased restrictions meant K2 paper would be sent as if it were legal mail. *Id.* at 86:3-6. Legal mail had to be opened in the presence of an inmate. It could then be inspected. *Id.* at 86:18-23. If it was determined that mail marked as legal mail was not actually legal mail, due to a strange smell (an indicator of the presence of K2 chemicals), or a misspelled attorney's name or incorrect address, staff did not have to open the mail in front of the inmate. *Id.* at 87:7-20 and 88:7-10.

A regimented procedure was in place for when a piece of suspicious mail was discovered to the mailroom. *Id.* at 88:19-22. Blevins expected procedures at other BOP facilities would be similar, though perhaps not

exactly the same. *Id.* at 150:16-19. Mailroom staff, BOP employees whose fulltime job it is to handle the mail, would contact technicians about the suspicious mail. *Id.* at 88:14-18. Technicians would speak directly to the staff member who had retrieved the item, and a chain of custody form would be completed, noting that person's information. *Id.* at 88-89:23-2. It would then be taken to an office that very few people could access, and secured there. *Id.* at 89:3-12. No notification would be provided to the inmate if mail of this kind were intercepted. *Id.* at 89:17-20. The chain of custody form included a line for an evidence control number, a number which allowed for digital tracking of the piece of evidence, *Id.* at 151:3-11; a line for suspect, *Id.* at 151:16-17; a line for date and time found, *Id.* at 151:19-21; a line for location, *Id.* at 151:24-25; a line for the person that recovered the evidence, *Id.* at 152:1-3; and whether it was placed in an overnight drop box, *Id.* at 152:10-13. In addition to the chain of custody form, a photo sheet documenting when photographs were taken of the evidence was completed. *Id.* at 153:15-20, Exhibit C-1 and C-2.

In August of 2017, exhibit 10.2 was intercepted by mailroom staff and according to the procedures in place at that time. *Id.* at 93:13-17. Blevins was contacted by a Mr. Rutherford, BOP staff, about the

suspicious mail. *Id.* at 131:8-11. The piece of mail was brought directly to Blevins from the mailroom, in the standard plastic envelopes the facility used to store things like this. *Id.* 131-32:25-2. As was standard procedure, Mr. Rutherford filled out a chain of custody form when he intercepted this piece of mail. *Id.* at 132:19-22. Individuals were to completely fill out this form as soon as possible when mail was intercepted. *Id.* at 148:8-19. Suspicious mailing evidence would not be accepted for collection by Blevins until a chain of custody form was completed. *Id.* at 149:16-18. The chain of custody form accompanied the piece of evidence throughout the facility. *Id.* at 150:5-7. Eventually, Blevins was contacted and asked if the facility had received any suspicious mail from the Pittsburgh area. *Id.* at 93:2-4. At some point, Blevins took pictures of the item and its contents. *Id.* at 94:11-13. Blevins met with Harpster and released the exhibit 10 mailing to Harpster by mailing it to him via FedEx, which was their standard practice. *Id.* at 94-95:18-4. Blevins made a photocopy of the FedEx slip. *Id.* at 94:9-10.

This contrasted drastically with the testimony provided by SIS Tech Ronald Randall, FCI-McDowell, to support the introduction of Exhibit 29. Similar to USP-Lee, at FCI-McDowell legal mail had to be

opened in front of the inmate, though that would usually take place on the unit. *Id.* at 165:19-25. When items marked legal mail were determined to not be legal mail, it no longer had to be opened in front of the inmate. *Id.* at 166-67:24-1. The mailroom staff would open the package to see what was inside. *Id.*at 167:1-3. SIS techs would be called about the mail. *Id.* at 167:7-10. The SIS techs would then assist the mailroom workers in identifying suspicious items and help to secure the suspicious items, placing it in a sealed Ziploc bag and then a locked filing cabinet. *Id.* at 167-68:22-7. There was no special bag used – just a Ziploc bag with an accompanying form. *Id.* at 168:8-11. That form was not the chain of custody form used by the USP-Lee mailroom but instead the correspondence form from the mailroom to an inmate. *Id.* at 168:10-15. The chain of custody form would only be completed when the suspicious item would become evidence in a case. *Id.* at 168:19-24. The item was not assigned any specific number for cataloging or other purposes; it was placed in a locked filing cabinet. *Id.* at 168-69:25-3. Limited staff had access to that filing cabinet. *Id.* at 169:4-9. A chain of custody form was only completed once the item was going to leave the facility, essentially to document to whom it was given. *Id.* at 169-70:21-12.

As for Exhibit 29.2, Randall never opened the envelope in which the mail arrived or inspected what had been discovered. By the time he got to the mailroom, items had already been sealed up. *Id.* at 173:20-25. That sealed slip was then taken by Randall to the associate warden's office. *Id.* at 173-74:20-2. An inmate notice form was completed by another person, Randall believed on August 23, 2017, though that recollection was based on looking at one of the forms while testifying. *Id.* at 195:4-5 and 193-94:22-3. Nowhere on either form was it documented who found the item, opened the item, secured the item, or placed mail into a secured envelope. *Id.* at 200:1-25. Furthermore, during cross examination, Randall was not aware of the procedures the mailroom had in place for mail entering the facility. *Id.* at 201-202:19-9. Specifically, the following exchange took place:

> **[Trial counsel]**: You don't know what the mailroom does to mail when it comes in; correct?
>
> **[SIS Randall]**: I'm not mailroom personnel. I don't know what their exact procedures are.
>
> **Q**: So you're not aware of their procedures; right?
>
> **A**: Correct.
>
> **Q**: So you wouldn't know how they opened it or what they did; right?

**A**: Correct.

**Q**: You don't know who opened it or what they did with it; right?

**A**: Correct.

**Q**: You know that they handed you a sealed bag; correct?

**A**: Correct.

*Id.* at 201-02:19-9.

While the burden to establish evidence as authentic is not a heavy one, there is still a requirement that it be done. The witness called by the government had no first-hand knowledge of the item in question. He had no direct knowledge of how it appeared when it arrived in the facility. He had no direct knowledge of what was inside when the package was opened. Randall could not confirm the item was properly documented and kept separate from other items and contaminants. The item's state when it arrived in the facility was of crucial importance considering the necessity of this special process (notifying the SIS personnel when a concerning piece of evidence came to the facility). Randall did not have *any* first-hand information about the item to confirm that what was presented in court was the same thing that made its way to the facility.

Furthermore, when Harpster arrived and took possession of Exhibit 29 the item was already in a sealed bag. Harpster had no opportunity to take a look at the pages or ensure that everything was in its proper state. It is simply assumption that it was properly sequestered when the mail was opened or it was properly maintained form the time it was found until the time the government took possession of it and the first chain of custody form was completed.

The contrast of procedures between FCI-McDowell and USP-Lee illustrates why further testimony was needed. The information about the Sterling Marshall mailing was much more detailed, including photographs taken of the item when it arrived. The staff member who found it documented the item and immediately wrote down important information. Proper inspection had to be done before SIS Blevins would even take custody of the item. Even with all that detail and quality control, a crucial error still occurred. While the date on the form was incorrect, other information about the item, information that came from SIS Blevins's direct, first-hand knowledge, allowed him to know that was incorrect, and what the correct date would have been. There is no way to know about similar errors with the Exhibit 29 mailing.

Furthermore, once the item was received by the DEA, care was taken to make sure it was kept separate and also information about it properly documented. Once Harpster received the item, he took those steps: "I placed it how it is inside of a DEA evidence envelope, and then it was packaged into our own plastic evidence bag. Then it was put into the drug evidence safe until the time I filled out the paperwork . . . And then I have to . . . package it in a FedEx box and ship it" to a DEA laboratory. NT 6/9/22 at 198:9-15. Because Harpster could not have taken those same procedures when he came to USP-Lee to review the things that Blevins had seized and could not have properly secured the evidence, he did not have take custody of it, instead requesting it be sent via FedEx. *See Id.* at 200-01:18-3 (DEA personnel did not take custody of the Sterling Marshall mailing because there was a possibility they would stay at a hotel that night and there was no way to secure the evidence).

It also can't be argued that because the item appeared similar to the Sterling Marshall mailing it was therefore authenticated, or authentication concerns should not apply. That argument assumes the exact issue argued by Mr. Curran, that there was nothing to support that the evidence presented was in the *same or similar* state as the evidence

that was first discovered. No witness testified as to the state of the evidence *when it was first discovered*. Such an argument bootstrapped the conclusion the government asked the jury to make to the uncertainty the government asked the jury to overlook.

With the concerns about transference of the substances, with the amount of mail opened in these mail rooms and concerns about other suspicious mail, the evidence should not have been allowed to be introduced. Mr. Curran was deprived of a fair trial due to its admission. This was a significant piece of evidence, upon which a great deal of the government's case rested. Mr. Curran is entitled to a new trial.

## C. Improper Statements During Closing Argument

Without any direct link between Mr. Curran and any other individual, the government's case relied on circumstantial evidence. The jury had to draw inferences from the scant direct evidence presented. While the case involved significant wiretapping, none of that pertained to Mr. Curran. While phone records from Mr. Curran's TruView were presented, Exhibit 18.1, the 412-872-0362 number was of critical importance. Establishing that phone number belonged to Mr. Curran's alleged co-conspirator Noah Landfried was essential for the government.

Failing to do that during the actual trial, the prosecutor for the government, in giving her closing argument, decided to just establish it on her own. Without any evidence supporting it, the prosecutor misstated the evidence twice, making erroneous claims of constitutional dimension, depriving Mr. Curran of a fair trial. Furthermore, the significantly more damaging statement was made after an objection by defense counsel, and an objection to this second statement was initially overruled, with a cautionary instruction occurring much later.

Considering "the reality of the human fallibility of participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508-09 (1983). "It is error for counsel to make statements in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a witness' testimony." *United States v. Watson*, 171 F.3d 695, 699 (D.C.Cir. 1999). "A misstatement of evidence is error when it amounts to a statement of fact to the jury not supported by proper evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith." *Id.* at 700 (citing to several D.C. circuit cases). "[A] criminal conviction is not to be lightly

overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young*, 470 U.S. 1, 11 (1985). In context, some objectionable content may be considered invited response – comment invited by or responsive to defense arguments. *Darden v. Washington*, 477 U.S. 168, 182 (1986). As the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'", *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)), invited response is less likely to inject that unfairness.

If error is found, a claim of prosecutorial misconduct is reviewed, in light of the record of the whole trial, to see if the error was constitutional or non-constitutional. *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d. Cir 1995). In order for such a remark to warrant a new trial, it must be shown that "it is *highly probable* that the error did not contribute to the judgment", *Id.* (quoting *Government of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976) (emphasis in *Zehrbach* but not in original), meaning a court must possess a "sure conviction that the error did not prejudice the defendant." *United States v. Jannotti*, 729 F.2d 213, 219-20 (3d Cir. 1984). In making that determination, a court considers "the scope

of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting conviction." *Id.* "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young*, 470 U.S. 1, 11 (1985). However, while the context of the entire trial, and the entire argument, must be considered, "it is true that irreparable harm may be inflicted in a moment." *Zehrbach*, 47 F.3d at 1267.

### 1. Errors by the Prosecutor

The errors by the prosecutor in her closing arguments were twofold. The closing argument proceeded as follows:

> **[Government counsel]**: Now, the BOP personnel explained to you that on August 23, 2017, that was the day that Mr. Curran's mail was seized. Now, you also heard that the BOP provides a letter, because they copy the legal mail. And they weren't about to just give it over to Mr. Curran. And along with that there came a slip. A slip that indicated 'Hey, your package was seized. You're getting a photocopy.' And on that same day the K2 paper he was expecting from Noah Landfried, Ross Landfried's little brother, a telephone number that we've associated with Noah Landfried.

**[Defense counsel]**: Objection. Not in evidence.

**The Court**: Overruled.

**[Government counsel]**: A telephone number that was identified as being in the 4Runner that Noah Landfried was identified on Dave Curran's TruView report.

**[Defense counsel]**: Objection. Not in evidence as to the 4Runner.

**The Court**: Overruled.

NT 6/10/22 at 126-27:10-2.

Neither assertion made by the prosecutor was supported by the evidence presented. First, the evidence did not support the claim that the phone number was associated with Noah Landfried. Second, the evidence did not connect *any phone number* to phones recovered from the 4Runner, much less the *exact phone number* needed to connect Noah Landfried to Mr. Curran.

### a. Associated with Noah Landfried

The evidence regarding the 412-872-0362 phone number was sparse. First, Mr. Curran registered that phone number in his inmate account on August 23, 2017, the day the package was given to Detective Harpster. NT 6/10/22 at 31:18-20. The name associated with the phone

number was "Bro Lil." Exhibit 18.1 at 2. There was no testimony given or record produced showing Mr. Curran ever called that phone number. There were two entries for "Bro Lil" in the address portion of Mr. Curran's TruView report: 650 Beaver Road, Ambridge, PA 15003 and 1021 5th Street, Pittsburgh, PA 15236. *Id.* at 21. There was no date associated with the entry of either of those addresses, though the report's end date was listed as August 28, 2018. *See generally* Exhibit 18.1. There were four phone calls between the 412-872-0362 and 412-653-1023, the phone number associated with Mr. Curran's mother. The x0362 number was called by Dashawn Burley, a person Harpster said had contacted Noah for K2 purchases.

Witnesses testified to a series of different nicknames for Noah Landfried. Joseph Perry testified that Noah's nickname was "Slick" as well as "Baby." NT 6/8/22 at 229:6-7. Special Agent Truesdell testified that "Baby" and "Slick" were the nicknames for Noah. NT 6/9/22 at 44:19-20. Detective Harpster, case agent and the officer through which much of the exhibits were introduced, stated that nicknames for Noah were "Baby", "Slick", and "Little Bro." NT 6/9/22 at 171:22-23. However, Nicholas Green, cellmate of Mr. Curran, testified that Mr. Curran would

refer to "somebody named 'Slick.' And then as time went on, [Mr. Green] learned that [the person's] name was Noah." NT 6/7/22 at 150:3-5. No witness testified that Mr. Curran used the nickname "Lil Bro" for Noah.

There were other individuals *associated* with 650 Beaver Road. There was no time period associated with the entry of 650 Beaver Road on Mr. Curran's TruView. The connection could be argued but the statement that the phone number was associated with Noah Landfried was an improper statement of the evidence.

The inference the government was asking the jury to make was that the 412-872-0362 was Noah Landfried's phone number or a phone number he used. But the evidence did not establish that. Inferences would be needed to come to that conclusion. If that logical connection was made, the TruView records would then provide a connection between Mr. Curran and Noah Landfried beyond the brief testimony of Nicholas Green. The government, through the prosecutor's argument, said the government had proven something that it really needed the jury to infer. In a circumstantial case such as this, that distinction is very important. It improperly takes from the jury an inference they needed to make. And in the final summation it is all the more important, as the various pieces

of evidence are put in the context suggested by each party, and then weighed by the jurors as they determine what has been proven during the past week of testimony.

## b. Phone in the 4Runner

Following defense counsel's objection regarding the association of Noah Landfried and the phone number at issue, the prosecutor responded with an extremely damaging and completely incorrect statement. Destroying any need for the jury to infer crucial aspects of the connection between Mr. Curran and Noah Landfried and essentially turning a circumstantial evidence case into a direct evidence case, the prosecutor claimed that a phone with the phone number at issue was found in the 4Runner Noah Landfried had crashed. Not only did this immediately link contact between Mr. Curran and Noah Landfried, but it also placed the phone in a vehicle that had stamps similar to the ones used on Exhibit 29 as well as other K2-soaked paper. There was no testimony about such a phone being found in the 4Runner. That would have been a crucial and damning fact in the case against Mr. Curran, and would have been discussed by the government from the opening of the case until the end. Not only did the government fail to present anything

supporting this claim during its presentation of evidence, but, as defense counsel placed on the record during the recess following the government's initial summation, it didn't match discovery materials provided to the defense *or* with information provided by the case agent when an evidence review was conducted. NT 6/10/22 at 138:18-22.

The prosecutor's misstatement was so damning because of its relationship to other evidence in the case. The government presented no evidence showing a direct link between Noah Landfried, the person essentially dubbed the center of the conspiracy by the government, and Mr. Curran. The government attempted to prove its case through things like the timing and nickname used for an entry on a TruView report in conjunction with the seizure of suspected narcotics, narcotics manufacturing taking place at that address (though at a much different time), the implication of conversations between Mr. Curran and his mother on recorded jail calls. All of these things were presented to support the connection between Noah Landfried and Mr. Curran. But with one remark, the prosecutor swept it all away and directly linked Noah and Mr. Curran. This was a more impactful statement than simply vouching for a witness's credibility, or questioning another witness's

motives, or providing personal beliefs about the state of the evidence. Instead of making improper comments that would lead a juror to view certain evidence in a way favorable to the prosecution, the statement created evidence that would do the job much more effectively.

It was also delivered at a time when it would have had a significant effect on the jury. The improper statement was made following an objection and a ruling by the trial court. The statement was then highlighted by another objection and then an adverse ruling[5]. The bell rung by this surprising statement was rung when focus would have been sharply on the dispute about this evidence. The evidence's veracity, at least for a time, was confirmed by the trial court. While "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" *Smith v. Phillips*, 455 U.S. 209, 219 (1982), factors such as "the evidence against the defendant, *the tactical context of the prosecutor's statements*, and whether the comments were invited by the defense's own context" have been considered in making this analysis. *Stermer v. Warren*, 959 F.3d

---

[5] The cautionary instruction eventually provided by the trial court is discussed *infra*, in the second factor of the analysis.

704, 725 (11th Cir. 2020) (citing to *Darden*, 477 U.S. at 181-183) (emphasis added)).

## 2. The ameliorative effect of any curative instructions given

Two objections were lodged to the prosecutor's comments, and both were overruled initially. After these objections, the prosecutor's closing argument continued for another eleven pages of transcript before a break is taken and the matter revisited. *See* NT 6/10/22 at 126-27:20-2 and 137:18 (objections and the court recessing, respectively). The jury was then allowed to take their lunch break and told to come back one hour later. *Id.* at 137:19-24. After counsel had returned and before the jury was brough back into the courtroom, trial counsel for Mr. Curran raised the issues again, and based on a concession by the government that the prosecutor had misspoken, *Id.* at 139:2-4, the trial court offered to provide a limiting instruction. The suggested instruction, essentially correcting the improper and incorrect statement made by the prosecutor, was opposed by the government. The prosecutor argued that

> "I don't think that's a necessary instruction to be provided by the Court. That's something that certainly [trial counsel] can establish. I intend to address that as well during my rebuttal, that I did misspeak. So I don't believe that a limiting instruction needs to be provided.

*It is something the jury can consider.* They can weigh that. It goes to the weight of the evidence. And it's fair game for argument, but I don't believe there needs to be a specific limiting instruction provided. It goes to the same type of instructions the Court has already provided as it relates to how the jurors can consider the evidence."

*Id.* at 141:5-16 (emphasis added).

The trial court ultimately decided to provide an instruction correcting the misstatement by the prosecutor and "allow counsel to clean that up however they want to." *Id.* at 142:5-6. The court instructed as follows:

"Before we turn to defense counsel, ladies and gentlemen of the jury, during the government's closing argument, two objections were made. The first objection I overruled. The second objection I also overruled. However, upon further consideration of the evidence, I am going to sustain the second objection.

So [trial counsel] had objected to a document that you were shown, and it had a phone number associated with 'Lil Bro.' And he had objected to the argument made by the government that that was from a phone that was recovered in Noah Landfried's 4Runner. There was no evidence that was put before you that that particular phone number was associated with a phone that was recovered from the 4Runner.

So on that point, I'm going to sustain the objection and order you to take that into consideration and disregard anything to the contrary when you are deliberating."

*Id.* at 142-43:18-8.

Defense counsel made passing reference to the phone number in question, but the prosecutor returned to the subject in her final closing:

"Now, to clarify, as I indicated, the government is not perfect. I'm certainly not perfect. And I did misspeak. The judge informed you that those records related to the phone connection between Noah Landfried and Judy Curran, which is a good thing the defense counsel caught that, because it allows me to explain to you that the testimony that you heard was that there were numerous phones in the 4Runner, about 15 of them. That was eight months after those phone records. That phone was just another one of the many that Noah Landfried had.

Additionally, as it relates to that phone, that was also the phone that had DaShawn Burley, Omari Patton, his son's phone number scattered through it."

*Id.* at 228-29:15-2.

The argument again referenced the 4Runner and the discovery of other phones, though it was only one of many that Noah Landfried possessed. However, no phone connected to that phone number was ever recovered, and the prosecutor's return to this subject frustrated the

purpose of the limiting instruction, if not undoing its ameliorative effect altogether.

"While in some cases an express instruction to the jury to disregard testimony injuriously admitted is properly held to cure the error, . . . courts are cautious in the application of this rule. It is not an easy task to unring a bell, nor to remove from the mind an impression once firmly imprinted there". *State v. Rader*, 124 P. 195, 196 (Oregon 1912). The instruction was provided long after the comment was made. Its curative effect was limited to begin with, and then further jeopardized by the prosecutor's final confused comments. The prejudice to Mr. Curran remained high.

### 3. The strength of the evidence supporting conviction

As argued above, the case against Mr. Curran was circumstantial and rested on inferences the government asked the jury to make. Defense counsel again and again emphasized that gaps in these inferential chains should be carefully scrutinized and that missing pieces, when ones were expected to be found, could lead to reasonable doubt. The most important connection would be a connection between Mr. Curran and Noah Landfried around the August 2017 mailing. The mailing contained

controlled substances, and if phone calls between the two were happening at the same time, the case would become much stronger for the government. Instead of properly relying on the evidence of record, a link was created and placed right in the middle of the case. That claim was made following an objection when eyes would be even more closely scrutinizing what had transpired. The evidence against Mr. Curran was not strong. This improper comment would have by far been the most damning evidence against him.

In summation, in *Zehrbach*, "the comments at issue were but two sentences in a closing argument that filled forty pages of transcript. Immediately after the objection, the court gave a specific instruction to disregard the prosecutor's comment, an instruction that the court repeated just a short time later at the close of the prosecutor's argument." 47 F.3d at 1267. Here, the more egregious of the two comments was made after an objection by defense counsel. The comment was highlighted by this objection. After the initial objection was overruled, counsel for the government then stated a "telephone number that was identified as being in the 4Runner that Noah Landfried was identified on Dave Curran's TruView report." NT 6/10/22 at 126:22-24. While the government's

closing argument took some thirty-five pages of transcript, these remarks stood out because of these objections and the decision by counsel for the government to double down on the improper remark and make a claim not at all supported by the evidence. While an instruction was given to the jury to disregard a portion of those remarks, that instruction was not delivered until after the government had completed its closing argument and after the jury had retired for a lunch break. *See Id.* at 138:9-10, 141-42:17-14, 142-43:18-9. And, any effect the instruction had on the jury was likely undone by the prosecutor's inexplicable reply, which seemed to suggest the opposite of what the judge had just instructed. *Id.* at 228-29:15-5.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "[T]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Id.* (internal quotations omitted). These remarks deprived Mr. Curran of a fair trial. His conviction must be vacated and a new trial granted.

# VIII. <u>CONCLUSION</u>

Based on the foregoing, Mr. Curran respectfully requests that this Court vacate his conviction and either discharge him or remand for a new trial.

Respectfully submitted:

*/S/ Michael Ovens*
Michael Ovens, Esq.
PA ID No. 317994
The Law Office of Michael Ovens
220 Grant Street, Suite 302
Pittsburgh, PA 15219
P: 412-368-3445
F: 412-219-5268
mike@ovenslaw.com

## CERTIFICATE OF ADMISSION, IDENTICAL TEXT, VIRUS CHECK

I, Michael Ovens, Esquire, hereby certify pursuant to LAR 46.1 that I am currently a member in good standing of the Bar of the Third Circuit Court of Appeals.

The text of the electronic format of the Brief of Appellant is identical to the hard copy format.

A virus check was performed on the Brief of Appellant using Avast One version 23.11.1.


Dated: March 4, 2024           */S/ Michael Ovens*
Michael Ovens, Esq.
PA ID No. 317994
The Law Office of Michael Ovens
220 Grant Street, Suite 302
Pittsburgh, PA 15219
P: 412-368-3445
F: 412-219-5268
mike@ovenslaw.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed.R.App.P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f), this document contains 11998 words.

This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century School Book.

Dated: March 4, 2024

*/S/ Michael Ovens*
Michael Ovens, Esq.
PA ID No. 317994
The Law Office of Michael Ovens
220 Grant Street, Suite 302
Pittsburgh, PA 15219
P: 412-368-3445
F: 412-219-5268
mike@ovenslaw.com

## CERTIFICATE OF SERVICE

I, Michael Ovens, counsel for Mr. Curran, hereby certify that in accordance with Fed.R.App.P. 25, on this date, I caused seven (7) copies of Appellant's Opening Brief to be dispatched by Federal Express Delivery, postage prepaid, to the Clerk of the Court for the United States Court of Appeals for the Third Circuit, and filed an electronic copy of the Brief via CM/ECF. I further certify that Appellant's Opening Brief and Appendix have been electronically served on the following counsel for Appellee:

Laura Irwin, Esquire
Assistant United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219


Dated: March 4, 2024

*/S/ Michael Ovens*
Michael Ovens, Esq.
PA ID No. 317994
The Law Office of Michael Ovens
220 Grant Street, Suite 302
Pittsburgh, PA 15219
P: 412-368-3445
F: 412-219-5268
mike@ovenslaw.com