No. 23-2643

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

UNITED STATES OF AMERICA,

Appellee

v.

DAVID CURRAN,

Appellant

———————

Appeal from Judgment of Conviction
Entered by the United States District Court
for the Western District of Pennsylvania (Ranjan, J.)
at Criminal No. 19-08

———————

**RESPONSE BRIEF FOR THE UNITED STATES**

———————

ERIC G. OLSHAN
United States Attorney

DONOVAN COCAS
Assistant U.S. Attorney

700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania

Tel:  (412) 894-7389
Fax:  (412) 644-6995

E-mail: donovan.cocas@usdoj.gov

# TABLE OF CONTENTS

**Pages**

JURISDICTION ................................................................................1

ISSUES PRESENTED AND STANDARDS OF REVIEW .........................2

STATEMENT OF FACTS.............................................................3

SUMMARY OF ARGUMENT...................................................15

ARGUMENT

  I.   CURRAN HAS NOT DEMONSTRATED THAT THE DISTRICT COURT ERRED IN DENYING HIS MOTION FOR JUDGMENT OF ACQUITTAL ....................................... 16

  II.  CURRAN CANNOT ESTABLISH THAT THE CHAIN OF CUSTODY FOR THE K2 PAPER MAILED TO HIM IN PRISON WAS SO FAULTY THAT ITS ADMISSION VIOLATED RULE 901 OF THE FEDERAL RULES OF EVIDENCE ........................................................ 29

  III. CURRAN HAS NOT SHOWN THAT THREE COMMENTS MADE BY THE PROSECUTOR IN SUMMATION SO INFECTED THE JURY'S DELIBERATIONS THAT HIS RIGHT TO A FAIR TRIAL WAS VIOLATED .............................. 38

CONCLUSION .........................................................................48

CERTIFICATES OF COMPLIANCE AND SERVICE

# TABLE OF CITATIONS

**Federal Cases**                                                                    **Pages**

Donnelly v. DeChristoforo,
  416 U.S. 637 (1974) ...................................................................................47

Ins. Brokerage Antitrust Litig.,
  618 F.3d 300 (3d Cir. 2010) ....................................................................18

Schlup v. Delo,
  513 U.S. 298 (1995) .................................................................................19

Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,
  530 F.3d 204 (3d Cir. 2008) ....................................................................18

United States v. Amirnazmi,
  645 F.3d 564 (3d Cir. 2011) ....................................................................27

United States v. Bailey,
  840 F.3d 99 (3d Cir. 2016) ..................................................... 17, 21, 24, 27

United States v. Boone,
  279 F.3d 163 (3d Cir. 2002) ....................................................................28

United States v. Caraballo-Rodriguez,
  726 F.3d 418 (3d Cir. 2013) ....................................................................18

United States v. Credico,
  718 F. App'x 116 (3d Cir. 2017)...............................................................33

United States v. Davis,
  2024 WL 1596669 (3d Cir. Apr. 12, 2024).............................................44

United States v. Dent,
  149 F.3d 180 (3d Cir. 1998) ............................................................ 32, 34

United States v. Fulton,
  837 F.3d 281 (3d Cir. 2016) ..........................................................*passim*

United States v. Gibbs,
  190 F.3d 188 (3d Cir. 1999) .................................................. 20, 22, 23, 26

United States v. Iglesias,
  535 F.3d 150 (3d Cir. 2008) ........................................................ 17, 22, 27

United States v. Jackson,
  649 F.2d 967 (3d Cir. 1981) ......................................................................2

United States v. Korey,
  472 F.3d 89 (3d Cir. 2007) ......................................................................21

United States v. Lall,
  852 F. App'x 625 (3d Cir. 2021)...............................................................17

United States v. Liburd,
  607 F.3d 339 (3d Cir. 2010) ......................................................................2

United States v. Lingala,
91 F.4th 685 (3d Cir. 2024)......................................................35

United States v. McKee,
506 F.3d 225 (3d Cir. 2007).....................................................26

United States v. Parker,
2023 WL 4117474 (3d Cir. June 22, 2023)............................46

United States v. Pavulak,
700 F.3d 651 (3d Cir. 2012)....................................................47

United States v. Perez,
280 F.3d 318 (3d Cir. 2002)....................................................26

United States v. Provenzano,
620 F.2d 985 (3d Cir. 1980)....................................................19

United States v. Pungitore,
910 F.2d 1084 (3d Cir. 1990)..................................................44

United States v. Pérez-Greaux,
83 F.4th 1 (1st Cir. 2023)........................................................41

United States v. Quinn,
728 F.3d 243 (3d Cir. 2013) ................................... 15, 16, 18

United States v. Rawlins,
606 F.3d 73 (3d Cir. 2010) ..................................... 29, 31, 33

United States v. Riley,
621 F.3d 312 (3d Cir. 2010)....................................................47

United States v. Robinson,
2023 WL 2133184 (3d Cir. Feb. 21, 2023)............................22

United States v. Robinson,
2024 WL 1007448 (3d Cir. Mar. 8, 2024) .................. 40, 44, 45

United States v. Rodriguez,
160 F. App'x 246 (3d Cir. 2005)............................................19

United States v. Salahuddin,
765 F.3d 329 (3d Cir. 2014)....................................................24

United States v. Smith,
294 F.3d 473 (3d Cir. 2002)................................................2, 26

United States v. Stiso,
708 F. App'x 749 (3d Cir. 2017)............................................47

United States v. Sussman,
709 F.3d 155 (3d Cir. 2013) ................................... 41, 42, 43

United States v. Trant,
924 F.3d 83 (3d Cir. 2019) .......................................................3

United States v. Tyson,
653 F.3d 192 (3d Cir. 2011) ........................................... 17, 24

United States v. Weatherly,
 525 F.3d 265 (3d Cir. 2008) .......................................................43
United States v. Welshans,
 892 F.3d 566 (3d Cir. 2018) .....................................................2, 45
United States v. Werme,
 939 F.2d 108 (3d Cir. 1991) .................................................. 38, 40
United States v. Young,
 470 U.S. 1 (1985) ............................................................ 38, 40, 46
United States v. Zehrbach,
 47 F.3d 1252 (3d Cir. 1995) ............................................ 38, 40, 47
United States v. Bailey,
 840 F.3d 99 (3d Cir. 2016) ............................................. 17, 22, 28
Werts v. Vaughn,
 228 F.3d 178 (3d Cir. 2000) .......................................................46

## Federal Rules and Statutes                                 <u>Pages</u>

18 U.S.C. §3231.............................................................................1
21 U.S.C. §846........................................................................*passim*
28 U.S.C. §1291.............................................................................1
Fed. R. App. P. 32......................................................................49
Fed. R. Evid. 901 .............................................................. 15, 35, 36

No. 23-2643

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

UNITED STATES OF AMERICA,

Appellee

v.

DAVID CURRAN,

Appellant

_____

Appeal from Judgment of Conviction
Entered by the United States District Court
for the Western District of Pennsylvania (Ranjan, J.)
at Criminal No. 19-08

_____

**RESPONSE BRIEF FOR THE UNITED STATES**
_____

## <u>JURISDICTION</u>

David Curran appeals his conviction. The district court had jurisdiction under 18 U.S.C. §3231. Appx1.[1] This Court has jurisdiction pursuant 28 U.S.C. §1291.

_____

[1] Citations to "Appx" refer to the multi-volume Appendix that Curran filed in support of his Opening Brief, cited as "Br." Citations to "SAppx" refer to the Supplemental Appendix filed with this Response Brief. Curran's Presentence Investigation Report will be cited as "PSR."

1

## ISSUES PRESENTED AND STANDARDS OF REVIEW

1.    Was the evidence sufficient to prove that Curran conspired to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. §846?

(a)    This issue is preserved.  Appx16-62.

(b)    Plenary review applies.  <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir. 2002).

2.    Did the district court err in overruling Curran's objection to the admission of drug evidence offered against him at trial under Rule 901 of the Federal Rules of Evidence?

(a)    This issue is preserved.  Appx701-05.

(b)    Abuse-of-discretion review applies.  <u>United States v. Jackson</u>, 649 F.2d 967, 973 (3d Cir. 1981).

3.    Did remarks by the prosecutor in summation so infect Curran's trial with unfairness as to make his conviction a denial of due process?

(a)    This issue is partially preserved because Curran objected to the first two remarks, Appx1460-61, but not the third.  Appx1562-63.

(b)    As to the two preserved objections, this Court's "review of the underlying legal issue --- whether [the prosecutor's] conduct deprived [Curran] of due process --- is plenary."  <u>See</u> <u>United States v. Liburd</u>, 607 F.3d 339, 342 (3d Cir. 2010).  But this Court's review of Curran's unpreserved objection is for plain error.  <u>United States v. Welshans</u>, 892 F.3d 566, 573 (3d Cir. 2018).

**STATEMENT OF FACTS**

Throughout his "Statement of the Case," Curran states the facts in the light most favorable to himself, often by accentuating evidence that was *not* offered at trial or by omitting mention of favorable prosecution evidence. Br.15-24. But this Court must "view the evidence in the light most favorable to the Government and draw all reasonable inferences in favor of the jury's guilty verdict." United States v. Trant, 924 F.3d 83, 86 n.1 (3d Cir. 2019) (citation omitted). The following Statement reflects that standard.

A. **2000s-2017: Despite the Efforts of Federal Authorities, Synthetic Cannabinoids Create a New Drug Epidemic in American Prisons.**

In the early 2000s, synthetic cannabinoids, commonly called "K2," hit the streets of America. Appx756-57, 915. The term "synthetic" is accurate because K2 consists of designer chemicals engineered in laboratories. Appx477. But the term "cannabinoid" is misleading because K2 users often experience reactions not seen with marijuana, such as violent behavior, hallucinations, convulsions, projectile vomiting, seizures, heart attacks, strokes, and death. Appx486, 529-30, 791-92, 916.

First-time users who believe that synthetic cannabinoids will be similar to marijuana begin using them because they often evade standard urine tests. Appx489-90. That feature makes K2 popular with people who expect to be tested for drugs, especially probationers or parolees. Appx458-59. Despite K2's unpleasant effects, users return to it because it is "highly addictive." Appx535-36, 569-70.

The Drug Enforcement Administration deems synthetic cannabinoids unsafe and has designated them Schedule I controlled substances. Appx460, 520, 756-57. Whenever DEA schedules a new chemical, it announces its actions publicly on the internet. Appx460, 473-74. Underworld chemists, if

they are alert, respond by altering a few molecules to create a new, uncontrolled synthetic cannabinoid.  Appx543.  Each countermove prompts DEA to scramble to schedule the newly-engineered substance.  Appx510, 1219-20.  And the cycle goes on.  Appx460, 520-21, 915-16.

Notwithstanding the advanced chemistry involved, making K2 is easy: drug-dealers in the United States buy synthetic cannabinoids in crystal form on the dark web.  Appx509, 862.  Then, one only needs room for a makeshift lab where the chemicals can be liquified in paint thinner or acetone and applied to paper by spraying or dipping.  Appx455, 509, 594-608, 656.  Once the paper dries, K2 users tear off a single "speck" of it, no larger than 1/8-by-1/8 of an inch, and smoke it in a cigarette or chew it to achieve the high. Appx457, 511-12, 529.

Despite aggressive countermeasures by the Bureau of Prisons, virtually any illegal drug that can be bought on the streets of the United States can be acquired by inmates.  Appx512, 788-89.  K2 is disruptive in prisons because the violence and medical emergencies it causes necessitate lockdowns in which all inmates are confined to their cells while staff cope with the chaos. Appx461, 713-14, 1183.  Inmates call K2 "the walking dead" or "wheelchair" because users either "walk around in a zombie state," or find themselves unable to walk at all.  Appx714.

K2 paper use exploded throughout BOP for several reasons.  Inmates who first used it outside of prison to avoid positive urine tests, Appx458, 489-90, brought their addictions with them when they were incarcerated. Appx570.  Quality K2 paper became difficult to distinguish from the ordinary letters, greeting cards, and legal documents which inmates were permitted to receive through the prison mail, making K2 easier to smuggle into prison than other illegal drugs.  Appx714-15, 789-90, 862-63.  One 8½-by-11-inch sheet

of K2 paper supplied thousands of doses, so it could fetch up to $3,000 when sold to inmates, enabling prison drug-dealers to live comfortably. Appx457-59, 1045-48.

Inmates in BOP cannot possess currency, Appx492, but they have built a black market economy. Appx461-62, 666. Postage stamps are used as informal currency. Appx665-66. Prisoners also can trade goods from their accounts at their facility's commissary. Appx461, 514-15. Through bank accounts administered by BOP, inmates can receive and send money outside the prison. Appx461-62, 579, 667. Prison drug dealers accept any or all of these means as payment for K2 paper. Appx539-40, 559-60, 579.

But even a piece of K2 paper slightly bigger than a driver's license commands $500 or more in prison. Appx458, 510-11. An inmate can only spend about $300 at the commissary each month, and there are limits to how many stamps he can keep in his cell safely. Appx560, 678. Money in inmate accounts is subject to forfeiture to satisfy court-ordered monetary judgments, and high balances raise red flags for BOP. Appx736, 782-84, 1058-59. To circumvent these problems, canny inmates ask friends or relatives outside the prison to conduct transactions for them using Western Union or online cash apps. Appx462-63, 496-96.

**B.    2017: Three Men From Pittsburgh Get in on the Ground Floor of the K2 Paper Boom in BOP.**

By 2017, BOP was experiencing a K2 paper epidemic. Appx522, 713, 915-19, 1131-32. Among those hardest hit were FCI-McDowell, a medium-security prison in West Virginia, and USP-Lee, a high-security penitentiary in Virginia. Appx532-34, 567-72, 751-52. Within those facilities, the three most important players in the K2-paper distribution racket at that time were

three friends from Pittsburgh named Noah Landfried ("Noah"), his older brother Ross Landfried ("Ross"), and Curran. Appx576, 856-57, 907-08, 920.

Noah, known as "Slick" but also called "Baby" and "Little Bro" in a nod to his younger-sibling status, Appx908, 1060, had served a lengthy federal prison term in the 2000s but was released from BOP custody by 2017. Appx858-59, 908-10, 1152-53. Upon his release, Noah returned to Pittsburgh and organized a conspiracy to traffic drugs, including K2. Appx859-60. Noah hired trusted ex-felons to manufacture K2 paper for him at multiple locations. Appx860-63. From his time in BOP, Noah knew legal mail could only be opened in the presence of the inmate. Appx794. So Noah printed his K2 paper with Supreme Court decisions and sent it disguised as legal mail in envelopes bearing the names and return addresses of real attorneys. Appx1085-87, see also SAppx4-5, 139-40.

One of Noah's customers was his own brother, Ross, also known as "Curly." Appx594-95, 858. Like Noah, Ross had gone to federal prison in the 2000s. Appx437. But unlike Noah, Ross remained in BOP custody in 2017 at USP-Lee. Appx857-58, 910, 1032. Ross sold K2 paper to many other inmates --- up to 50 in his unit --- and he "bragged" that "his brother" was supplying it. Appx573, 585. Ross only had the one brother, Noah, who worried that Ross was "having too much fun" making money selling K2 paper at USP-Lee. Appx919, 1102. Indeed, because Ross "was the drug guy," his fellow inmates "kissed his ass." Appx592.

Another of Noah's customers was Curran, who was serving a 22-year sentence at FCI-McDowell in 2017. Appx446, 525-27; see also PSR ¶55. Curran was a longtime friend of Noah and Ross, having grown up with them in Pittsburgh. Appx536-37, 920. Known in prison as "Big Bird" or "Pitt," Appx527-28, Curran was a large-scale K2-paper dealer at FCI-McDowell by

2017. Appx533. A notorious "loudmouth," Curran told multiple inmates across multiple prisons that a childhood friend he called "Slick" or "Noah" was manufacturing his K2 paper and sending it to him disguised as legal mail. Appx536-37, 974-77.

The K2-paper arm of Noah's confederacy operated undetected until August 23, 2017, when a yellow manila envelope marked as "legal mail" arrived at USP-Lee for an inmate named Sterling Marshall. Appx786. Postmarked August 15, 2017, the envelope was ostensibly from a real Pittsburgh-based attorney and mailed from the U.S. Post Office at zip code 15290 in Pittsburgh. SAppx5; see also Appx1090-92. BOP mailroom personnel at USP-Lee noted, however, that the envelope bore this red-stamped missive: "Special Mail Open Only in the Presence of the Inmate (28CRF 540.19) [*sic*]." See Appx1086-92. Misspellings are red flags for contraband, Appx716-17, so USP-Lee intercepted the envelope, which contained a U.S. Supreme Court opinion, SAppx4, and gave it to their Special Investigations Services Technician ("SIS Tech"), who stored it and its contents in a locked cabinet. Appx718-21.

A similar scenario was unfolding simultaneously at USP-McDowell. Also on August 23, 2017, a yellow manila envelope, ostensibly from a Pittsburgh attorney, arrived in the mailroom for Curran. Appx799-801. That envelope was mailed from the same U.S. Post Office (15290) and postmarked the same day (August 15, 2017) as the envelope sent to Marshall at USP-Lee. Appx1092. And there was another similarity: the envelope for Curran bore the same red-stamped claim, "Special Mail Open Only in the Presence of the Inmate (28CRF 540.19) [*sic*]." Appx1086-92; see also SAppx140. Mailroom personnel inspected that envelope, which also contained a Supreme Court

opinion, SAppx139, and diverted it to a SIS Tech at FCI-McDowell, who stored it in a locked cabinet. Appx1085.

**C.    2017-18:   After   DEA   Learns   of   Landfried's   K2-Paper Manufacturing Conspiracy and its Participants, a Grand Jury Indicts Noah, Ross, Curran, and Others for their Respective Roles.**

DEA began investigating rumors that Noah was trafficking heroin and cocaine in Pittsburgh in 2017. Appx498. But in early 2018, Noah crashed his Toyota 4Runner in Pittsburgh and abandoned it. Appx857-58. Inside, investigators found resume paper and envelopes which indicated that Noah was sending K2 paper into prisons, as well as approximately "15 [cellular] phones." Appx858, 1096-97. The wreck also contained a "special mail" ink stamp which, like the stamp used to mark the Curran and Marshall envelopes, had a bogus citation to the Code of Federal Regulations.[2] So by February 2018, DEA notified BOP to be on the alert for suspicious mail postmarked from Pittsburgh. Appx721, 758.

Almost immediately, BOP officials at USP-Lee responded that they had seized the suspicious letter destined for Marshall in August 2017, so DEA's Pittsburgh office dispatched Task Force Officer ("TFO") Eric Harpster to investigate. Appx721-22. TFO Harpster drove to USP-Lee in March 2018 and, after reviewing the item addressed to Marshall, had it FedExed to DEA

---

[2] The ink stamp found in the 4Runner read: "Special Mail. Open only in the presence of the inmate. 26 CFR 560.18 [*sic*]." See Appx1203-04. While this was a slightly different stamp than the one used on the Curran and Marshall envelopes seven months earlier, see id., it was equally spurious: there is no such regulation.

in Pittsburgh. Appx722-23.[3] A few months later, when Harpster learned of the similar mail intercepted for Curran, he drove to FCI-McDowell, took custody of the mail from its locked cabinet, and drove the item directly back to DEA's evidence locker in Pittsburgh. Appx1085-86.

TFO Harpster FedExed the Curran mail and the Marshall mail, envelopes and all, double-sealed in plastic and in separate canisters to DEA's laboratory for testing per standard procedure. Appx1087-90, 1252-54. DEA chemists confirmed that the Curran mail tested positive for ADB-CHMINACA and 5F-MDMB-PINACA --- both synthetic cannabinoids which had been controlled substances before they were mailed in August 2017 --- as well as 4-CN-CUMYL-BUTINACA, a synthetic cannabinoid which was not controlled at that time but would be scheduled in mid-2018. Appx488, 1088. Lab results also confirmed that the Marshall mail tested positive for the same three synthetic cannabinoids. Appx1092-93.

**D. 2019: After a Grand Jury Indicts Noah, Ross, Curran, and Many Others for their Roles in the K2-Paper Conspiracy, DEA Searches One of Noah's K2-Paper Laboratories and Uncovers the Connections Between the Landfrieds and Curran.**

In January 2019, a Grand Jury in the Western District of Pennsylvania handed down an Indictment charging Noah and dozens of others with an array of felonies, including drug distribution, money laundering, and racketeering. PSR ¶1. DEA executed search warrants at several locations: including the home of James Perry, an ex-convict who made some of Noah's K2-paper out of his garage. Appx856-68, 901, 933-39. Items there tested positive for 5F-MDMB-PINACA. See Appx939-40. Perry cooperated, confirming DEA's

---

[3] TFO Harpster could have taken the Marshall mail with him, but he had it FedExed because the return drive to Pittsburgh was long and any hotel he could find might not have an adequate safe. Appx1089-90.

suspicion that "Noah was calling the shots" in the sprawling drug-distribution conspiracy and that Noah was, among other things, sending his K2 paper to Ross at USP-Lee. Appx859, 864.

An inmate incarcerated with Ross at USP-Lee named Humberto Herrera also cooperated with DEA. Appx568-69. Herrera admitted that he had delivered K2 paper for Ross inside USP-Lee and echoed Perry's statement that Ross obtained the paper from Noah. Appx568-76, 585. Another inmate named Kenneth Lawson also cooperated, stating that he also delivered Noah's K2 paper for Ross at USP-Lee. Appx662-72. Financial records showed that Ross wired money from his prison account to Noah. SAppx34-40, 67-71, 74. Ross also subscribed to an e-mail[4] newsletter which, among other things, tracked DEA's scheduling of new synthetic cannabinoids. Appx1144-51.

DEA scrutinized the connections between Ross and Marshall, the addressee of the letter that USP-Lee intercepted in August 2017. SAppx4-5. Marshall and Ross both were from Pittsburgh and were incarcerated together at USP-Lee in 2017. Appx1051, 1096. According to Lawson, Marshall and Ross "always hung out" in prison and they "jumped" an inmate who took K2 paper from Ross without paying for it. Appx669-71, 696, 726. And Marshall had a connection to Noah: a cellphone recovered from the wreckage of Noah's 4Runner had a text-message string from Marshall. Appx1095-98; see also SAppx27. BOP records showed that, on numerous occasions, Marshall sent money from his prison account to Elise Klavon, Noah's "real girlfriend" outside of prison. SAppx28-34; see also Appx1035-38, 1061. Ross knew Klavon and funneled money to her, too. Appx1061; see also SAppx70, 74.

---

[4] Inmates can only receive e-mail from addresses that they pre-register, which precludes them from receiving spam. Appx465-66.

Finally, DEA connected Curran to the Landfried brothers because he bragged about how Noah supplied his K2 paper. Appx536-37, 974-77. Like Ross, Curran subscribed to e-mails which included updates about DEA's scheduling of synthetic cannabinoids. Appx1144-51. And though not incarcerated with Curran, Ross told BOP that he had a sibling called "Big Bird" whose address was one number off that of Curran's mother, Judy Curran. Appx1158-59; see also SAppx71, 78. But unlike Ross, Curran could not take full advantage of his BOP inmate account because he knew that a high balance could be seized to satisfy the enormous money judgment attached to his federal conviction. Appx1058; see also PSR ¶¶55, 93. So Curran cajoled Judy Curran, his 70-year-old mother, to send and receive money for him outside of BOP. Appx991, 1083-84, 1155-56, 1287-95.

Further digging revealed that, on August 23, 2017 --- the same day FCI-McDowell mailroom personnel notified Curran that his Pittsburgh "legal mail" been seized, Appx845-46 --- Curran added a new contact to his TruView[5]: "Lil, Bro" with the phone number (412) 872-0362 (the "0362 number") and an address of 650 Beaver Road, Ambridge. SAppx42, 61; see also Appx1152-55. That moniker was significant because "Little Bro" was one of Noah's nicknames. Appx908, 1060. Toll records for the 0362 number memorialized repeated communications between that number, and two other

---

[5] TruView are inmate-specific BOP business records which contain, among other things, all of an inmate's contacts. Appx734-35. An inmate cannot telephone any number not listed on his TruView, but BOP does not verify the accuracy of the information (including the names) that an inmate gives for those contacts. Appx467.

numbers, including Judy Curran's. Appx1155-57.[6] And the 650 Beaver Road address was a Pittsburgh-area rental property owned by the Landfried family. Appx594-95. When authorities searched 650 Beaver Road, it contained one of Noah's K2-paper manufacturing facilities. Appx595-608. Laboratory testing of items recovered from that address confirmed the presence of ADB-CHMINACA, 5F-MDMB-PINACA, and 4-CN-CUMYL-BUTINACA. SAppx133. Those same three chemicals were found on the mail BOP intercepted for Curran and Marshall. Appx1088-93.

Armed with this information, plus evidence DEA had gathered about the rest of Noah's drug-distribution empire, in June 2019 the Grand Jury handed down a Superseding Indictment charging 48 people --- including not only Noah and Ross, but also Curran, Marshall, and Perry --- with Conspiracy to Distribute and Possess with Intent to Distribute Schedule I, II and III Controlled Substances from January 2017 to January 2019, a violation of 21 U.S.C. §846. See PSR ¶2.

As many of the defendants gradually pleaded guilty, including Marshall and Perry, see PSR at p.2, the district court partitioned the remaining trial-bound defendants into three groups. Appx140-41. Pertinently here, Noah was convicted in the first group at trial. Br.7-8. Curran and Ross constituted their own two-defendant group, see Br.8, and they proceeded to trial together in June 2022. PSR ¶8.

---

[6] The other phone which repeatedly contacted the 0362 number belonged to DaShawn Burley. Appx1157-58. Burley was a Pittsburgh man who helped his father --- an inmate named Omari Patton who had become friends with Noah --- smuggle Noah's K2 paper into FCI-Fort Dix in New Jersey, where Patton was housed during this period. Appx867, 896, 906, 1102-03.

The record adduced at the Curran/Ross trial was generally as set forth above. See Appx178-1584. But beyond those mentioned already, four items of testimony merit mention now. First, an inmate named Nicholas Green, who had been Curran's cellmate at FCI-McDowell, testified that he helped Curran distribute K2 paper there in 2017 and attested that Curran told him he was obtaining it from Noah on credit. Appx532-42. Second, another inmate named Raymond Fields, who was incarcerated on unrelated state charges at Allegheny County Jail ("ACJ") when Curran was transferred to his pod to await trial on these charges in 2021, testified that Curran had told him that these federal charges arose when he was "caught with a package coming in the mail" full of K2. Appx976-77. Fields added that Curran began smuggling K2 into ACJ through a corrupt guard who collected the K2 paper from Judy Curran. Appx974-76. Third, a corrections officer at Cambria County Prison named Jerrad Baker testified that, when Curran was transferred to that facility to await trial on these charges in 2022, Curran asked Baker if he would like to make "an extra couple thousand dollars" by contacting "a female via cell phone number that [Curran] would" provide, and meet her to get chemical-treated "paper" that Baker would smuggle into the prison. Appx1002-12. And fourth, Joseph Evans, who had known the Landfried brothers for decades, testified that one of Noah's nicknames was "Little Brother." Appx908.

Neither defendant testified. Appx1308-13. Curran moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, but the district court denied his motion because "the cooperator type" testimony that the United States had offered, which could "be viewed by a rational jury as credible," was evidence which "in and of itself would satisfy the elements" of the charged offense. Appx1326-32.

The jury convicted Curran and Ross. Appx148. Curran filed a written post-trial motion for judgment of acquittal, which the United States opposed. Appx16-48. The district court denied that motion, too, citing not only the direct evidence --- specifically, Green's testimony about Curran's admissions --- but also the corroborative circumstantial evidence. Appx74-76. Ultimately, the court sentenced Curran to 36 months in prison to be followed by six years of supervised release. Appx2-6.

This timely appeal followed. Appx1.

# SUMMARY OF ARGUMENT

Downplaying the case against him as "circumstantial," Curran insists there was too little to convict him of conspiring with anyone. Br.24-33. But Curran was a "loudmouth" who bragged to two inmates that he worked with the Landfrieds to get K2 into FCI-McDowell. Appx536-37, 974. And a defendant's boasts to other inmates are *direct* evidence. United States v. Quinn, 728 F.3d 243, 263 (3d Cir. 2013) (*en banc*). Here they proved all the elements of 21 U.S.C. §846, as the district court found. Appx74-76, 1332.

Curran's attack on the chain of custody for the K2 paper destined for him at FCI-McDowell also fails. Br.34-43. The precautions taken in securing that evidence were adequate, especially when comparing its distinctive characteristics with those on the item Noah sent to Marshall *the same day* from *the same post office* with *the same uniquely-erroneous "CRF" stamp.* Compare Appx1086-87 with Fed. R. Evid. 901(a)(4). Curran's baseless suggestion that FCI-McDowell contaminated his mail is irreconcilable with his admission that he was "caught" receiving Noah's K2 paper. Appx977.

Finally, Curran's contention that he is entitled to a new trial because of three comments by the prosecutor during argument is meritless. Br.44-60. The first remark argued inferences from the evidence. Appx1460. The second misstated one item of evidence, Appx1460-61, but the prosecution so conceded and the district court read a curative instruction. Appx1472-77. Curran never objected to the third remark, which occurred in rebuttal, Appx1562, and he cannot show that it was *plainly* anything other than a fair response to his own summation. The three remarks did not "so infect[] the trial with unfairness" as to make Curran's conviction a denial of due process. United States v. Fulton, 837 F.3d 281, 306 (3d Cir. 2016) (cleaned up).

15

**ARGUMENT**

## I. CURRAN HAS NOT DEMONSTRATED THAT THE DISTRICT COURT ERRED IN DENYING HIS MOTION FOR JUDGMENT OF ACQUITTAL.

Curran insists that the evidence was too thin to support his conviction for the charged conspiracy. Br.24-33. He contends that the case against him was entirely "circumstantial," see Br.22, 24, 44, 50-51, 57, but that is untrue. A consummate "loudmouth," Curran admitted to multiple inmates at multiple facilities that he was smuggling Noah's K2 paper into FCI-McDowell with the help of his own elderly mother. Appx532-42, 974-77. Words out of a defendant's own mouth are *direct* evidence. See Quinn, 728 F.3d at 263. If a rational jury could believe this testimony, and the district court ruled that it could, it was sufficient to convict Curran. Appx1332. The circumstantial evidence that the United States offered was corroborative icing on the cake, as the court also noted. See Appx74-75.

This Court begins by identifying Curran's offense of conviction and its elements. United States v. Mike, 655 F.3d 167, 174 (3d Cir. 2011). The Superseding Indictment alleged that, "from in and around January 2017 through in and around January 2019," Curran knowingly and unlawfully conspired with Ross "and with persons both known and unknown to the Grand Jury to distribute and possess with intent to distribute Schedule I and II controlled substances," specifically ADB-CHMINACA and 5F-MDMB-PINACA, a violation of 21 U.S.C. §846. See Appx1405; see also PSR ¶¶2, 8. To prove a violation of Section 846, the United States was required to show (1) a shared unity of purpose between Curran and any other person; (2) an intent to achieve the common goal of possessing with intent to distribute and/or distribution of a controlled substance; and (3) an agreement to work

16

together toward that goal.  <u>United States v. Bailey</u>, 840 F.3d 99, 108 (3d Cir. 2016).  The third element is the conspiratorial agreement.  <u>United States v. Tyson</u>, 653 F.3d 192, 206 (3d Cir. 2011).

This Court's review of the denial of a defendant's motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure is "highly deferential."  <u>See</u> <u>Bailey</u>, 840 F.3d at 109.  As this Court explained:

> A sufficiency challenge fails if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  In reviewing its sufficiency, the evidence is viewed as a whole, not piecemeal, and we do not weigh evidence or determine the credibility of witnesses.  Furthermore, when the facts support conflicting inferences, we must presume --- even if it does not affirmatively appear in the record --- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

<u>Id.</u> (cleaned up); <u>see also</u> <u>United States v. Iglesias</u>, 535 F.3d 150, 155 (3d Cir. 2008) (noting the appellant's "extremely high" burden on sufficiency-of-the-evidence review).

Curran insists that none of the three elements of 21 U.S.C. §846 were proved.  Br.24-33.  The United States will parse and address each of his arguments as to each element separately.  For now, it suffices to say that all of Curran's arguments are meritless, and some are even frivolous in light of the evidence.

### A.  Unity of Purpose

Primarily, Curran attacks the proof of any unity of purpose.  <u>Compare</u> Br.25-28, 32-33 <u>with</u> <u>Bailey</u>, 840 F.3d at 108.  Curran claims that "[t]here was no *direct* evidence of an agreement" between him and Noah and "no *direct* evidence of contact" between the two.  <u>See</u> Br.26 (emphases added).  While "direct evidence is not required to demonstrate a unity of purpose," see <u>United</u>

States v. Lall, 852 F. App'x 625, 628 & n.13 (3d Cir. 2021) (citing United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (*en banc*)), Curran's claim that there was no direct evidence of his guilt is wrong. Green, who was housed in Curran's unit at FCI-McDowell and was his cellmate during 2017-2018, Appx524-26, testified that he sold K2 paper for Curran and attested that Curran told him Noah was making the K2 paper and mailing it to him. Appx532-37.[7] Green added that Noah "fronted" all of his K2 paper to Curran. Appx541.

Green's testimony eviscerates Curran's contention that his prosecution was based entirely upon "inferences," an assertion he makes *19 times* in his discussion of the sufficiency of the evidence alone, see Br.24-33, and *more than 100 times* in his Opening Brief. "[A] conversation explicitly manifesting the existence of the agreement in question" is direct evidence of a conspiracy which "requires no inferences" whatsoever. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 325 n.23 (3d Cir. 2010). Such direct evidence can be disbelieved, but if believed it demands nothing more of the jury. See, e.g., Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 222 (3d Cir. 2008) (noting that a statement by a vice president of a corporate defendant was "direct evidence of collusion, which, if believed, requires no further inference"). Green's personal observations, which included his clear recollection of Curran's damaging admissions, was *direct*, not circumstantial evidence of their shared objective. Quinn, 728 F.3d at 263.

---

[7] Boxed in by his refrain of the-evidence-against-me-was-entirely-circumstantial, Curran can concede no more than that Green "understood Noah" to be the source of the K2 paper. Br.30. But Curran ignores the *reason* Green understood this: which was because *Curran told him* that "Slick," who Green learned was Noah, had been sending it to him. Appx536-37. There was no evidence that anyone other than Noah was called "Slick." Appx1130.

Evidentiary labels aside, the district court properly found that Green's testimony was "in and of itself" sufficient to survive Curran's motion for judgment of acquittal. Appx1332. Evidence is "sufficient to establish a conspiracy and to tie" a defendant to it, even where it was "not overwhelming" and came "from only one witness whose veracity was certainly open to question." United States v. Provenzano, 620 F.2d 985, 1000 (3d Cir. 1980). The case against Curran was even stronger, because the prosecution presented *two* witnesses who directly connected Noah to Curran through the latter's braggadocio. In addition to Green, Fields testified that Curran told him that he was "caught" having Noah's K2 paper mailed to him at FCI-McDowell. Appx976-77. Fields had no axe to grind: he had been at ACJ on state charges; unlike Green, Fields had no involvement in the Landfried conspiracy, and Fields gained nothing by testifying because he had finished his state sentence by the time Curran was tried. Appx977-81.[8] The testimony of Green and Fields meant that "the sufficiency issue here is a credibility issue," and credibility determinations are "for the jury alone." United States v. Rodriguez, 160 F. App'x 246, 248 (3d Cir. 2005) (unpublished) (citing *inter alia* Schlup v. Delo, 513 U.S. 298, 330 (1995)).

---

[8] Though he all but ignores Fields's testimony now, Curran recognized how devastating it was at trial. The sole witness Curran called was Justin Andrascik, an ACJ guard since 2020. Appx1296-98. Andrascik testified that, on his watch, the inmates would not have been allowed as much interpersonal contact as Fields described, but Andrascik admitted that he could not say how closely other guards supervised the inmates. Appx1298-1304. In rebuttal, the United States called Jason Batykefer, who had been employed at the ACJ since 2006; Batykefer attested that it was up to the pod officer how closely to supervise the inmates and discussed all of the ways inmates evade supervision at ACJ, including through inappropriate relationships with guards. Appx1379-1400.

Instead of addressing that evidence, Curran complains that the United States offered "no testimony" about how he paid Noah for his K2 paper. Br.27-30. But nothing required the prosecution to offer such testimony to establish a violation of 21 U.S.C. §846, and Curran ignores the circumstantial evidence. The many connections between Curran and the Landfried brothers, discussed in the Statement of Facts, *supra*, was strong circumstantial evidence bearing on every element of Section 846. It suffices to say that there was *no evidence* that Noah ever gave anyone K2 paper for free; he even charged Ross for it. SAppx34-40, 67-71, 74. That is why inmates who did not pay for Noah's K2 paper were subject to anal abuse or beatings. See Appx574, 670-71. Indeed, *nobody* gave Curran K2 paper, which was why he hounded his own customers for payment when they fell into arrears. Appx541-42. There is no reason to think Noah treated Curran any more favorably than he treated his own brother. So a rational juror could infer that Curran was paying for Noah's K2 paper somehow. See United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) ("[A] conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference that the activities of the participants [...] could not have been carried on except as the result of a preconceived scheme or common understanding.").

Regardless, the prosecution explained the absence of direct Curran-to-Noah payment testimony and offered strong circumstantial evidence showing how such transactions must have occurred. It showed that inmates who choose not to move money through their BOP inmate accounts will direct friends or relatives outside the prison to conduct transactions for them using Western Union or various cash applications, and that such exchanges are "extremely difficult" to trace. Appx462-63, 496-96. With a large outstanding federal money judgment against him, PSR ¶¶55, 93, Curran had more reason

than most inmates to avoid using his prison account. Appx1058. Indeed, Green testified that, when *he* paid Curran for K2 paper, he used hard-to-trace methods, including money orders sent to Judy Curran. Appx538-41. Other evidence in the record confirmed that Curran preferred such "street-to-street" exchanges. Appx991, 1083-84, 1155-56, 1287-95. Toll records revealed several communications between Judy Curran's phone and the 0362 number. Appx1155-57. That 0362 number was the one Curran registered after FCI-McDowell seized Noah's K2 paper, assigning that number to "Lil, Bro" on his TruView with the address of a Landfried-family property where Noah ran one of his K2-paper labs. See SAppx42; see also Appx594-608, 845-46, 907, 1060, 1152-55. This evidence made it reasonable to infer that, just as Curran directed Green to send money to Judy Curran, he directed Judy Curran to forward money along to Noah.

### B. Intent to Achieve a Common Illegal Goal

Curran's challenge to the sufficiency of the evidence of the next element --- his intent to achieve the common illegal goal of selling scheduled synthetic cannabinoids in the prison, Bailey, 840 F.3d at 108 --- also fails. Br.28-32. Because the alleged conspiracy involved the distribution of Noah's K2 paper, satisfaction of this element required the United States to prove that Curran "shared a goal with his co-conspirators to further th[at] purpose." United States v. Korey, 472 F.3d 89, 93 (3d Cir. 2007). Green's and Fields's testimony, summarized *supra*, established that Curran shared this goal.

If that testimony were not enough, there is no getting around August 23, 2017, the day mailroom staff at FCI-McDowell informed Curran that it had seized his bogus "legal mail." Appx845-46. Curran responded to that news the same day by updating his TruView to add the 0362 number for "Lil, Bro" with the address of a Landfried-family property that Noah was using as

a K2 lab. SAppx42; <u>see also</u> Appx594-608, 907, 1060, 1152-55. A rational jury could find that the relationship between these two events was causal, not coincidental, and that Curran and Noah were "working together to achieve their common goal of bringing drugs into the prison." <u>United States v. Robinson</u>, No.22-1600, 2023 WL 2133184, at *3 (3d Cir. Feb. 21, 2023).

Curran's response to this evidence is to argue it only established "a buyer-seller relationship." Br.28. That argument is assessed against the six <u>Gibbs</u> factors, which include: (1) "the length of affiliation between the defendant and [alleged coconspirators]"; (2) "whether there is an established method of payment"; (3) "the extent to which transactions are standardized"; (4) "whether there is a demonstrated level of mutual trust"; (5) whether "transactions involved large amounts of drugs"; and (6) whether the defendant purchased his drugs on credit. <u>Bailey</u>, 840 F.3d at 108-09 (quoting <u>Gibbs</u>, 190 F.3d at 199-200).

The six <u>Gibbs</u> factors "differentiat[e] between one who merely buys drugs from a drug conspiracy, and one who is an actual member of [it]." <u>Bailey</u>, 840 F.3d at 108. The factors are neither exclusive nor volumetric, so occasional participants can be members of the conspiracy. <u>Gibbs</u>, 190 F.3d at 198; <u>see also</u> <u>Iglesias</u>, 535 F.3d at 156 (finding that a conspiracy existed where a buyer acquired drugs from a seller "once or twice" and where the seller fronted drugs to the buyer and awaited payment until after sales). Not all of the factors need be present to defeat a buyer-seller defense, and even one factor "furthers the inference that the [defendant] knew that he was part of a larger operation." <u>Gibbs</u>, 190 F.3d at 199-200.

All of the <u>Gibbs</u> factors exist in Curran's case. The evidence at trial showed a lengthy affiliation between Curran and his "childhood friend[s]," Noah and Ross. Appx536-37, 920. That affiliation was ongoing: Curran

monitored Noah's progress outside prison and gave a non-incarcerated acquaintance his phone number in 2017, albeit one that had been disconnected because Noah switched phones so often. Compare SAppx1 with Appx868-69. And Ross listed Curran, a/k/a "Big Bird," on his TruView as a "sibling." Appx1158-59; see also SAppx71, 78. Even within the conspiracy, Curran's and Noah's dealings were repeated. Appx536-37. The second and third Gibbs factors were met by process of elimination. Of the three ways BOP inmates can buy contraband, Appx461-62, the first only applies in inmate-to-inmate transactions: and Noah was no longer an inmate. Appx1061. The second option was Curran's BOP account, but his large money judgment made that too risky. Appx1058. That left only the third option, which was paying Noah through street-to-street transactions of the sort that Curran used for collecting money from his own customers, including Green. Appx539-41. Finally, evidence that Noah trusted Curran enough to send him thousands of dollars' worth of K2 paper --- *always* fronting it to him, see Appx538-41 --- satisfied the fourth, fifth, and sixth Gibbs factors.

Sidelining this evidence, Curran suggests there was no evidence that he *ever* received *any* K2 paper from Noah. See Br.27. For this proposition, he cites Green's testimony that Curran once obtained paper in the mail thinking that it "might be K2" but, when smoking a few pieces produced no high, Curran realized it was regular paper and "started to get K2 from someone else at the institution." Appx537-38. However, Green did not say who mailed Curran that inert paper or provide a timeframe for when this "one-time thing" occurred. Id. *Every* piece of Noah's paper DEA tested contained controlled substances, Appx1292-93, so it seems unlikely that Noah sent anyone ordinary Supreme Court opinions on a lark. But even assuming that Noah did send it, Green's testimony that Curran attempted to smoke it shows that

Curran *believed* that it would get him high, Appx537-38, confirming a prior understanding that Noah would be mailing him K2 paper. Given that the United States was not required to prove that anyone accomplished any of the conspiracy's goals, United States v. Salahuddin, 765 F.3d 329, 341-42 (3d Cir. 2014), Green's recollection of that epic K2-fail, if it was one, is not a lifeline for Curran, but an anchor binding him to Noah's conspiracy.

Regardless, Curran reads Green's testimony in isolation. What Green actually attested was that Curran "*was getting* the *K2 paper*" --- not merely *did* get, once, a package with ordinary paper --- from someone he learned was "Slick" and, "as time went on," Noah: language indicating that the Curran-Noah dealings recurred for a substantial period. Appx536-37 (emphasis added). And Curran's reading cannot be squared with his later statement to Fields at ACJ, which was that Curran had been indicted federally after FCI-McDowell "caught" him getting Noah's K2 paper through the mail. Appx976-77. Read together and in context, the Green-Fields testimony established that Noah was the regular source of Curran's K2 paper, including the batch FCI-McDowell seized in August 2017.

### C. Agreement to Work Together Toward the Common Illegal Goal

Weakest of all is Curran's attack on the third element of 21 U.S.C. §846, which concerns an agreement to work together toward a common illegal goal. Compare Br.32-33 with Bailey, 840 F.3d at 108. Inasmuch as this element is satisfied by proof that *anyone* conspired with anyone else, Tyson, 653 F.3d at 206, Curran's argument is frivolous based on the connections between and among him, Noah, Ross, and Marshall.

Those interconnections are summarized in the Statement of Facts, *supra*, and will not be repeated. For now, though, one facet of that factual collective bears highlighting: the uncanny similarity between the mail that

USP-Lee intercepted for Marshall on August 23, 2017, see SAppx4-5, and that of the mailing FCI-McDowell caught headed for Curran that same date. SAppx139-40. Both were large yellow envelopes postmarked August 15, 2017; both were sent from the same U.S. Post Office; both bore return addresses of Pittsburgh attorneys; and both were stamped in red ink with the flawed citation to "(28CRF 540.19)." Appx799-801, 1086-92.

The odds of different people mailing these items coincidentally are very low. Just focusing on the envelopes' contents --- Supreme Court opinions saturated in ADB-CHMINACA and 5F-MDMB-PINACA, Appx1092-93 --- the odds that they would contain the identical two controlled synthetic cannabinoids *and* the same uncontrolled synthetic cannabinoid (4-CN-CUMYL-BUTINACA in this case) by pure chance were under 1 in 65,000.[9]

---

[9] These odds flow from a conditional probability calculation assuming the 26 synthetic cannabinoids scheduled by 2017. See Centers for Disease Control, "Notes from the Field: Outbreak of Severe Illness Linked to the Vitamin K Antagonist Brodifacoum and Use of Synthetic Cannabinoids - Illinois, March-April 2018," http://dx.doi.org/10.15585/mmwr.mm6721a4 (last visited Apr. 27, 2024). If a K2-paper manufacturer treated paper with two different synthetic cannabinoids out of the 26 scheduled by 2017, a total of 325 combinations were possible ((n-1) + (n-2) + (n-3) etc.). The odds that two K2-paper manufacturers employing that strategy would choose the same two controlled synthetic cannabinoids by chance were 1 in 325. But the number of *unscheduled* synthetic cannabinoids is indeterminate, so this figure excludes the odds of the same two controlled substances appearing on two unrelated batches of K2 paper with 4-CN-CUMYL-BUTINACA. Even assuming a closed universe of only 200 unscheduled cannabinoids, which is the most conservative number possible, see Centers for Disease Control, "About Synthetic Cannabinoids," https://www.cdc.gov/nceh/hsb/chemicals/sc/About.html (last visited Apr. 29, 2024) (noting that "[h]undreds of different synthetic cannabinoid chemicals are manufactured and sold" with new ones emerging every year), the odds of two K2-paper manufacturers independently using the same two controlled synthetic cannabinoids, *plus* the identical uncontrolled synthetic cannabinoid, were 1 in 65,000 (1 in 325 x 1 in 200).

All by itself, the identity of the scheduled and unscheduled synthetic cannabinoids inside the two mailings permitted the inference that a conspiracy involving Noah and Curran was afoot, even if Curran was unaware of every coconspirator's identity or role. United States v. Perez, 280 F.3d 318, 343 (3d Cir. 2002). This supported more than "an assumption that an agreement must have been in place," Br.26; it showed the improbability of these events occurring together *unless* an agreement was in place.

But even construed as an attack on the evidence that *he* had joined Noah's conspiracy, Curran's argument spans six sentences without citation to authority or the record. Br.32-33. It is as unpersuasive as it is terse. Again, the evidence that the seizure of Noah's K2 paper by FCI-McDowell's mailroom staff on August 23, 2017 prompted Curran to add the "Lil, Bro" 0362 number to his TruView that same day showed that the mailing was "part of an agreement" between Curran and Noah, not a "random, uncoordinated act[]." See Smith, 294 F.3d at 478-79. BOP did not know that the envelope was from Noah at that moment since the sender was identified as a Pittsburgh attorney, see SAppx139-40, so FCI-McDowell could not have told Curran that it intercepted anything from Noah. The fact that Curran prepared to contact Noah immediately after learning that the prison intercepted this envelope betrayed "a preconceived scheme or common understanding" that the intercepted mail would be K2 paper from Noah. Gibbs, 190 F.3d at 197; see also United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007) (observing that a conspiratorial agreement can be "inferred from the conduct of the defendant and others").

If that were not enough, consider that BOP facilities are among the most secure, highly-surveilled structures anywhere. Appx753-54. K2 paper has never been permitted there and BOP was watching for it. Appx576, 789-93.

Given these constraints, Curran could not hope to get Noah's paper into FCI-McDowell "without at least an understanding in place between the parties" about how they expected to bypass BOP safeguards. United States v. Amirnazmi, 645 F.3d 564, 593 (3d Cir. 2011). And that required countersurveillance, of which three instances appear in this record: (1) Curran's subscription to an e-mail newsletter with updates on the scheduling of synthetic cannabinoids;[10] (2) Noah's careful creation of envelopes to disguise his K2 paper as "legal mail"; and (3) Curran's updating of his TruView on the day he learned that FCI-McDowell seized his "legal mail" so he could alert Noah of the snafu. Appx1144-55; see also SAppx4-5, 139-40. Countersurveillance shows a shared "stake in the continued viability of [the] drug operation," and permits the inference that Curran and Noah were coconspirators, not mere buyer-sellers. Bailey, 840 F.3d at 110.

The bottom line is that Curran cannot meet his "extremely high" burden of demonstrating that the evidence was insufficient to permit a rational juror to convict him of conspiring with Noah, Ross, or their confederates to distribute K2 paper in violation of 21 U.S.C. §846. Iglesias, 535 F.3d at 155. Curran's mischaracterization of the proof against him as entirely

---

[10] Inmates, including Curran, knew synthetic cannabinoids became illegal upon DEA scheduling. See Appx428, 572, 918, 1144-51. Green and other prisoners at FCI-McDowell conferred about "figur[ing] out another chemical to put on the paper that wasn't illegal so that they really couldn't say it was against the law." Appx543. Since Curran could not make K2 paper himself, monitoring DEA schedules and looking for loopholes would have been a pointless use of his limited e-mail time, Appx682-83, unless he was relaying what he learned to Noah. Given the presence of 4-CN-CUMYL-BUTINACA on Noah's K2 paper before it was controlled, Appx488, 1088, it is reasonable to infer that Curran conveyed this information to Noah with some success.

circumstantial ignores his admissions to Green and Fields, which were *direct* evidence. This testimony alone established all of the elements of a conspiracy. Appx1332. And while no corroborative evidence was necessary, see United States v. Boone, 279 F.3d 163, 188 (3d Cir. 2002), ample circumstantial evidence corroborated Curran's admissions. It took careful planning to get any K2 paper past vigilant BOP mailroom personnel in multiple facilities, and Curran's immediate reaction when he learned that FCI-McDowell intercepted his ersatz "legal mail" proves that he and Noah worked in concert to accomplish that goal. Coordinated criminality is the essence of a conspiracy, and the evidence of it that Curran's jury heard easily "passes the 'bare rationality' test." Bailey, 840 F.3d at 110. So the verdict must stand.

## II. CURRAN CANNOT ESTABLISH THAT THE CHAIN OF CUSTODY FOR THE K2 PAPER MAILED TO HIM IN PRISON WAS SO FAULTY THAT ITS ADMISSION VIOLATED RULE 901 OF THE FEDERAL RULES OF EVIDENCE.

Next, Curran contends that the United States failed to establish the authenticity of Exhibit 29, consisting of the K2 paper and the envelope that BOP mailroom intercepted en route to him at FCI-McDowell. Br.34-44; see also SAppx139-40. Curran argues that, because FCI-McDowell employed somewhat different procedures in documenting its handling of the K2 paper mailed to him than those employed by USP-Lee after it intercepted Marshall's K2 paper, the comparative "gaps" in the chain of custody made Exhibit 29 inadmissible. Br.35-43. Quite properly, the district court rejected this argument before trial, see Appx136-37, and again at trial. Appx697-709.

"To establish a chain of custody sufficient to make evidence admissible," the Government "need only prove a rational basis from which to conclude that the evidence is what the [Government] claims it to be." United States v. Rawlins, 606 F.3d 73, 82 (3d Cir. 2010) (quotation marks omitted). The "burden is not a heavy one," and Rule 901 of the Federal Rules of Evidence does not require "that evidence may only be admitted if a complete and exclusive chain of custody is established." Id. (cleaned up). While "serious" gaps may render a chain of custody so deficient that exclusion is required, "in the ordinary case gaps in the chain go to the weight of the evidence, not its admissibility." Id. at 82-83 (citation omitted). This Court "afford[s] great deference" to a trial court's conclusion regarding the sufficiency of a chain of custody, and that decision "may not be overturned absent a clear abuse of discretion." Id. at 83 (cleaned up).

Within the parameters of that standard of review, the pertinent facts are these: At all relevant times, the mailroom at FCI-McDowell was in a complex

to which only BOP employees --- no inmates --- had access. Appx790-91. In the same restricted complex, and also inaccessible to inmates, was the suite used by the SIS Techs, whose jobs included investigating contraband sent through the prison mail and other violations of BOP rules. Appx787-91.

On August 15, 2017, someone went to the U.S. Post Office at zip code 15290 in Pittsburgh and mailed an envelope from a Pittsburgh attorney to Curran at FCI-McDowell, marked as legal mail. Appx800-02, 1086-76; see also SAppx139-40. On the outside of the envelope, the sender had used an ink stamp to place the following: "Special Mail Only Open in the Presence of the Inmate. (28CRF 540.19)." Appx1203-04. The "CRF" citation misspelled "CFR," and running the Title and the abbreviation together was another obvious typo. See Appx1086.

That parcel arrived at FCI-McDowell's mailroom on August 23, 2017. Appx799. Aware of the K2 paper infiltrating its facilities by 2017, BOP mailrooms had begun scrutinizing legal mail carefully, viewing misspelled envelopes as suspicious. Appx716-17. If mailroom personnel spotted red flags, they telephoned any attorney whose name appeared on legal mail to determine whether s/he did, in fact, represent the inmate and whether s/he mailed him that item. Appx795. If the attorney denied either, or if the mailroom remained otherwise unpersuaded that the item was legitimate, the item was designated as non-legal mail exempt from BOP's requirement that the mail be opened in the inmate's presence. Appx795-96.

After following FCI-McDowell's procedures with respect to the item addressed to Curran, mailroom personnel flagged the item as suspicious, opened it, and inspected its contents, which consisted of a printed version of a Supreme Court decision. Appx786, 801, 1085-86. That day, mailroom personnel sent Curran a form alerting him that this particular mail had been

intercepted because it did "not meet BOP criteria of special mail handling." Appx794-801. Then, mailroom personnel placed the original envelope and its contents into a plastic bag with a copy of the form that Curran received. <u>Id.</u>

These tasks finished, FCI-McDowell's mailroom staff sealed the envelope, its contents, and the form into a plastic Ziploc bag and summoned SIS Tech Ronald Randall. Appx799-801. SIS Tech Randall responded and, without opening the sealed plastic bag, took it to the Associate Warden's suite, where he locked it in a cabinet that same day: <u>i.e.</u>, August 23, 2017. Appx802-03, 828-29. Randall obtained the key from the Associate Warden, who had the only key to that locked cabinet. Appx798. And though other suspicious items were stored in that locked cabinet, all were likewise in sealed plastic bags to prevent cross-contamination. Appx803. Per FCI-McDowell policy, no chain of custody form was created on August 23, 2017 because the Curran mailing was not part of an active case. Appx797-99.

The Curran mailing remained in its sealed plastic bag in the locked cabinet until September 14, 2018, when TFO Harpster arrived at FCI-McDowell to retrieve it. Appx1084-85. There was no evidence of tampering and SIS Tech Randall knew of none. Appx803. When Harpster arrived, Randall created a chain-of-custody form memorializing the item's delivery to DEA. Appx799. Randall then handed the sealed plastic bag and its contents to Harpster. Appx834-35. Without opening the sealed plastic bag, Harpster drove it "directly" to Pittsburgh and stored it in DEA's drug-evidence locker. Appx1085. Once it was time to test the item, Harpster sealed that still-sealed plastic bag and its contents into a second plastic bag and, per DEA policy, FedExed it to DEA's laboratory. Appx1087.

Taking an accentuate-the-negative approach to this evidence, Curran points out that the United States did not offer the testimony of any mailroom staff who intercepted his "legal mail" at FCI-McDowell on August 23, 2017 to establish "the circumstances in which it was discovered": it only offered the testimony of SIS Tech Randall, who was not present when mailroom staff found and opened the item. Br.33. As such, Curran complains that Randall "could not confirm [that Exhibit 29] was properly documented and kept separate from other items and contaminants" by FCI-McDowell mailroom staff. Br.41. Citing "concerns about transference of the substances, with the amount of mail opened in these mail rooms," Curran insists that Exhibit 29 was too dodgy to be admitted. Br.44. But these concerns cannot withstand scrutiny.

The United States was not required to offer testimony from the FCI-McDowell mailroom personnel who intercepted and inspected the Curran mailing in the minutes before they handed it to SIS Tech Randall. Curran seems to have no serious quibbles with the procedures that USP-Lee used in handling the Marshall mailing. See Br.35-38, 42. The testimony established that USP-Lee and other BOP facilities, to include FCI-McDowell, employed consistent procedures for handling mail suspected of containing synthetic cannabinoids at all relevant times. Appx779. "[A] trial court may presume regularity in public officials' handling of contraband." United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998).

Turning this presumption inside out, Curran suggests that, absent contrariwise testimony from the FCI-McDowell mailroom staff who intercepted his mail, the district court should have assumed Exhibit 29 was compromised by "contaminants." Br.41. Evidence that such contamination actually occurred might overcome the presumption, Dent, 149 F.3d at 188,

but Curran offers none: only innuendo, and that is not enough.  United States v. Credico, 718 F. App'x 116, 120-21 (3d Cir. 2017).  Regardless, doubts about contamination go to the weight a jury afforded Exhibit 29, not its admissibility.  Rawlins, 606 F.3d at 83.  Unavailingly, defense counsel conjured the specter of contamination during summation at trial.  Appx1489.

It was rational for the jury to reject the invitation to speculate that significant contamination occurred.  Curran has never specified what "contaminant" might have been transferred onto his "legal mail" through mishandling by the mailroom staff at FCI-McDowell.  Compare Br.42 with Appx1557.  The only synthetic cannabinoids found on Curran's K2 paper were ADB-CHMINACA and 5F-MDMB-PINACA, which were controlled substances, and 4-CN-CUMYL-BUTINACA, which was not yet scheduled.  Appx1088.  But there was no evidence that any other chemicals could combine to create those synthetic cannabinoids, so ADB-CHMINACA, 5F-MDMB-PINACA, and 4-CN-CUMYL-BUTINACA are the only "contaminants" that could have mattered.  Consequently, Curran's theory of contamination assumes that some *other* item or items in FCI-McDowell's mailroom contained these three synthetic cannabinoids and transferred all three of them onto his paper, somehow sparing the envelope.

Even assuming that this scenario is possible despite Noah's firsthand experience that this compound "dries quick," SAppx141, consider the raw probabilities again.  If there is less than a 1 in 65,000 chance that two unrelated items would carry the same two scheduled synthetic cannabinoids plus the same unscheduled synthetic cannabinoid, then assuming that the Curran mailing originally contained none of these chemicals would not change the calculus: there is still less than a 1 in 65,000 chance that *something else* in FCI-McDowell's mailroom on August 23, 2017 just happened to carry the

same chemical cocktail present on Marshall's K2 paper at USP-Lee. Once one piles atop those odds the incalculable odds that these were the *only* synthetic cannabinoids transferred to the contents of Curran's envelope, any conjecture about meaningful contamination becomes difficult to entertain.

Still less persuasive is Curran's argument about the next "gap" in the chain of custody that he identifies. Curran contends that, after SIS Tech Randall retrieved the item from FCI-McDowell mailroom staff and locked it up on August 23, 2017, the day it was intercepted, no one knows "what might have happened in between" then and September 14, 2018, the day TFO Harpster took custody of it. Br.33. According to Curran, it "is simply assumption that [Exhibit 29] was properly sequestered when the mail was opened or it was properly maintained from the time it was found until the time [Harpster] took possession of it." Br.42. The record refutes these arguments.

SIS Tech Randall testified that, when he collected the Curran mailing on August 23, 2017, it was "secured in a Ziploc sealed bag" that he never opened. Appx797-804, 828. So there is no chance that Randall could have contaminated its contents. Randall took the Curran mailing to a wing of FCI-McDowell to which only a select few BOP staff (the Associate Warden and the SIS Techs) had access. Id. Suspicious items were kept in a locked filing cabinet in that wing. Id. The Associate Warden had the only key, so Randall obtained it and locked the Curran mailing inside. Id. Every item in the cabinet was sealed separately in plastic to prevent cross-contamination. Id. The Curran mailing remained *in situ* until TFO Harpster retrieved it in September 2018, and Randall attested that he did not believe Curran's mailing had been tampered-with. Id. This was enough. Dent, 149 F.3d at 189 (upholding chain of custody for evidence kept in a locked storage bin, even though it had been moved to other bins without following logging procedures). Theoretically,

the Associate Warden or a SIS Tech *could* have unlocked the cabinet, removed the Curran mailing, and saturated it with the same two controlled synthetic cannabinoids that DEA's lab would only find *several months later* on the Marshall mailing that, unbeknownst to anyone at FCI-McDowell in West Virginia, USP-Lee had intercepted in a Virginia. But there is no evidence that this farfetched scenario actually occurred.

Finally, Curran insists that the striking similarities between the mailing intercepted for Marshall at USP-Lee and his own could not satisfy Rule 901 of the Federal Rules of Evidence absent proof that his own mailing "was in the same or similar state" when FCI-McDowell mailroom staff seized it. Br.43-44. This argument is curious because Curran never denies that the Marshall mailing introduced at trial was in its original condition. Br.35-38, 42. Both envelopes were postmarked on the *same* date, mailed from the *same* U.S. Post Office in Pittsburgh, and stamped with the *same* typographically-erroneous, red-inked missive. Compare SAppx4-5 with SAppx139-40. Absent evidence that anyone at FCI-McDowell ever saw the item seized by USP-Lee, and vice versa, only DEA could have doctored one to resemble the other after seizing both by late 2018. But there is zero evidence that this happened. The substantial identity of the envelopes suggests that they were in the same state as when they were seized. Compare SAppx4-5, 139-40 with Appx799-801, 1086-92; see also United States v. Lingala, 91 F.4th 685, 696 (3d Cir. 2024).

So that leaves only the contents of the Curran envelope. Given Curran's acceptance of USP-Lee's handling of the Marshall mailing, presumably he does not contend that the ADB-CHMINACA, 5F-MDMB-PINACA, and 4-CN-CUMYL-BUTINACA found on its contents got there through contamination or tampering. So to accept Curran's theory that the contents of

his own mailing were contaminated or tampered-with, two things must be true. First, either by whim or mistake, Noah must have mailed Curran a Supreme Court case on ordinary, untreated paper the same day that he sent Marshall a Supreme Court case on K2 paper. That part is theoretically possible, Appx537, but unlikely because every piece of Noah's K2 paper that any prison tested contained at least one controlled substance. Appx1292-93. And second, one must assume that, in August 2017, FCI-McDowell mailroom personnel happened to foul Noah's pristine paper with the same three synthetic cannabinoids that *no one* at BOP would know --- until DEA laboratory analysis in November 2018 --- was on the paper that Noah had sent to Marshall at USP-Lee. Appx1093; see also SAppx135. There is no realistic possibility that this happened.

The bottom line is that Curran's quibbles with the mailroom and storage procedures employed by FCI-McDowell in 2017 did not raise chain-of-custody concerns so serious as to require the exclusion of Exhibit 29 at trial. Curran's self-serving speculation that his mailing might have been contaminated while in FCI-McDowell's mailroom or in its Associate Warden's locked cabinet has no evidentiary support to take it beyond the realm of a slender --- and on this record, vanishingly remote --- possibility. Regardless, "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," may authenticate it. Fed. R. Evid. 901(b)(4). The "CRF" stamp on the Curran and Marshall envelopes, together with their simultaneous mailing from the same U.S. Post Office, was about as distinctive as it gets. And these envelopes did not contain a naturally-produced and generic controlled substance such as marijuana, cocaine, or heroin. Both contained designer drugs with distinctive chemical compositions engineered in

laboratories, the same two controlled synthetic cannabinoids, and even the same third (then-uncontrolled) synthetic cannabinoid.  If the Marshall mailing was admissible under Rule 901 of the Federal Rules of Evidence, and Curran never disputes that it was, then so was Curran's.

### III. CURRAN HAS NOT SHOWN THAT THREE COMMENTS MADE BY THE PROSECUTOR IN SUMMATION SO INFECTED THE JURY'S DELIBERATIONS THAT HIS RIGHT TO A FAIR TRIAL WAS VIOLATED.

Last, Curran complains of three remarks that the prosecutor made during summation at trial. Br.44-59. He argues that the prosecutor "misstated the evidence twice" during her closing argument and then made a third, "significantly more damaging" misstatement in rebuttal. Br.45. A review of the record confirms that only *one* of the three comments was objectionable, as the prosecutor conceded at trial. But since the district court ultimately sustained the objection and issued a curative instruction, neither that comment nor the two bookending it, both fair and benign, can justify a new trial.

The prosecution has "considerable latitude" in summation. United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991). But it "may not misstate evidence." Fulton, 837 F.3d at 306. Crossing that line "does not always warrant the granting of a mistrial." United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995) (*en banc*). This Court weighs the challenged remarks under a harmless-error standard and reverses only if they prejudiced the defendant when "taken in the context of the trial as a whole." Id. As that holistic standard reflects, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." United States v. Young, 470 U.S. 1, 11 (1985).

Additional background is necessary now. As noted *supra*, Noah crashed and abandoned his Toyota 4Runner full of "K2 stuff" in Pittsburgh in March 2018, about seven months after BOP's seizure of the Curran and Marshall "legal mail." Appx868, 1289. In addition to bogus legal mail destined for prisons, another ink stamper, and resume paper, the wreckage contained about 15 cellphones. See Appx867-68, 1096-97, 1290-91. While

DEA could not crack all of the cellphones, see Appx1247, it accessed two successfully. One retained a Marshall-Noah text-message string in which Marshall referred to Ross. Appx1094-98. Another contained text messages in which Noah told a woman whose boyfriend was incarcerated at USP-Lee to "ask him about Ross and the amount [t]o send." Appx1098-1102.

While no phone associated with the 0362 number was recovered, DEA learned of the phone's existence through Curran's "Lil, Bro" TruView update. Appx1152-53. DEA knew the 650 Beaver Road address was a Landfried-family-owned property that Noah used to make K2 paper, Appx494-95, 1153-54, so agents obtained toll records for the 0362 number. Appx1155-56. Two numbers of note had contact with that phone. First, the 0362 number had repeated contact with a cellphone used by Burley, who obtained Noah's K2 paper to send to his father, Patton, at FCI-Fort Dix. Appx867, 1157-58. And second, there were several calls between the 0362 number and Judy Curran. Appx1155-56.

So contextualized, each of the three remarks that Curran challenges on appeal --- and, to the extent he objected, the district court's responses --- will be evaluated severally through the standard of review applicable to each. Curran's overall complaint about the remarks is that they supposedly misstated evidence "of critical importance" --- to wit, the seizure of the phone associated with the 0362 number --- to "turn[] a circumstantial evidence case into a direct evidence case." Br.44, 51. Here again, Curran forgets the direct evidence the jury *already* heard against him, including his admissions to Green and Fields. Ultimately, none of the prosecutor's remarks, taken individually or collectively, can justify a new trial.

*A. The Prosecutor's First Remark was Proper and the District Court Acted Within its Discretion in Overruling Curran's Objection.*

After recounting the circumstances under which Curran added the 0362 number to his TruView, in summation the prosecutor said this was "a telephone number that we've associated with Noah." Appx1460. Curran objected that this was "not in evidence," but the district court overruled him. Id. He claims this was error, Br.48-51, but he is incorrect.

As detailed *supra*, four facts associated the 0362 number with Noah. First, Curran added the 0362 number to his TruView the day he learned FCI-McDowell seized Noah's K2 paper. Appx1152. Second, the association of the 0362 number with "Lil, Bro" was telling because, as Noah's long-time friend Evans later testified, "Little Bro" was one of Noah's monikers. Appx908; see also Appx1152-53. Third, Curran linked the 0362 number with 650 Beaver Road, a Landfried-family-owned property that Noah used as a K2-paper lab. Appx1153-54. And fourth, toll records for the 0362 number showed its repeated contact with Burley and Judy Curran: two people whose only known commonality was in assisting their relatives in BOP custody (Patton and Curran, respectively) to obtain Noah's K2 paper. Appx1155-58.

Against this evidentiary tableau, the district court properly overruled Curran's objection. A prosecutor "may state [her] views of what the evidence shows and the inferences and conclusions that the evidence supports." Zehrbach, 47 F.3d at 1265 n.11. The prosecution "has considerable latitude to argue the evidence and any reasonable inferences that can be drawn from" it. See United States v. Robinson, No.22-2795, 2024 WL 1007448, at *3 (3d Cir. Mar. 8, 2024) (cleaned up) (quoting Werme, 939 F.2d at 117). That is all the prosecutor did here. Appx1460.

Curran suggests that, because the prosecutor characterized the 0362 number as one "we've associated with Noah," Appx1460, rather than something along the lines of "*you can infer* that the 0362 number was associated with Noah," she mischaracterized circumstantial evidence as though it were direct. Br.50-51. But Curran offers no reason to think that the jury would have interpreted the remark that way. See, e.g., United States v. Pérez-Greaux, 83 F.4th 1, 31 (1st Cir. 2023) (holding that prosecutor's statement in summation that a firearm police recovered had "matched" the defendant's did not misstate evidence, even though the officer only attested the two were "similar" to a third firearm, because "it appears that in making its closing argument, the government was inviting the jury to infer" a match).

Even if the jury could interpret the remark as Curran does, he cites no case holding that mischaracterizing circumstantial evidence as direct evidence during summation "so infect[s] [a] trial with unfairness" as to require a new trial. Fulton, 837 F.3d at 306. No unfairness appears here. The district court told Curran's jury how to differentiate direct from circumstantial evidence and it explained, correctly, that "[t]he law makes no distinction of weight to be given to either direct or circumstantial evidence." Appx1425-26. Presumably obeying these instructions, see United States v. Sussman, 709 F.3d 155, 180 (3d Cir. 2013), Curran's jury must have recognized that an inference was required to connect the 0362 number to Noah. The jury either drew that inference, or it did not. If it did not, the jury convicted Curran based on other evidence tying him to Noah's cabal, particularly the testimony of Green and Fields. Appx532-42, 974-77. So it is unclear how such a misstatement, if it was one, could have denied Curran due process.

*B. The Prosecutor Conceded that Her Second Remark Misstated the Evidence, and Curran Cannot Show that the Jury Disregarded the Curative Instruction the District Court Gave.*

Immediately after that first comment, the prosecutor stated that "[a] telephone number that was identified as being in the 4Runner that Noah Landfried was identified on Dave Curran's TruView report." Appx1460. Curran objected that this was "not in evidence as to the 4Runner," and initially the district court overruled him. Appx1460-61. But at the next break, and before defense counsel gave their arguments, the parties alerted the court that this had been a misstatement, confirmed that the 4Runner contained no phone associated with the 0362 number, and agreed that Curran's objection to the second remark should have been sustained. See Appx1472-73.

The district court asked Curran whether he had a proposed curative instruction, to which defense counsel replied: "That the phone number associated with the [toll] records was not found on a phone recovered from the 4Runner and that phone was, in fact, never recovered." Appx1474-75. The court proposed an instruction along the following lines:

> You heard during the closing argument [counsel for Curran] objected to facts not in evidence. I've had an opportunity to further review or discuss that evidence with counsel. And the particular phone number that was shown to you in the government's closing argument associated with "Lil[,] Bro," there is no evidence in the record that that is from a phone that was recovered from the 4Runner.

Appx1475-76. Hearing no objection to that instruction, the court resolved to give it, invited "counsel to clean that up however they want to," and confirmed that Curran's objection to the prosecutor's first remark remained overruled. Id.

Back on the record, the district court read the jury a curative instruction, as follows:

> [D]uring the government's closing argument, two objections were made. The first objection I overruled. The second objection I also overruled. However, upon further consideration of the evidence, I am going to sustain the second objection. So [defense counsel] had objected to a document that you were shown, and it had a phone number associated with "Lil[,] Bro." And he had objected to the argument made by the government that that was from a phone that was recovered in Noah Landfried's 4Runner. There was no evidence that was put before you that that particular phone number was associated with a phone that was recovered from the 4Runner. So on that point, I'm going to sustain the objection and order you to take that into consideration and disregard anything to the contrary when you are deliberating.

See Appx1476-77. None of the parties objected to that curative instruction. Id.

Once more, Curran must show that the district court erred, but he cannot. A misstatement will require reversal only if it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." See Fulton, 837 F.3d at 306 & n.189 (cleaned up). To ascertain whether that has happened, the remarks must be evaluated in light of "the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Id. at 306 & n.190. None of these factors justifies reversal on this record.

First, the prosecutor's remark was not severe, but confined to the phone associated with the 0362 number. Such "brief and isolated" remarks are generally not reversible. United States v. Weatherly, 525 F.3d 265, 273 (3d Cir. 2008). That *phone* was not found in the 4Runner, but its *number* was linked to Noah when Curran added it to his TruView for "Lil, Bro" at 650

Beaver Road on the day FCI-McDowell notified Curran that the mailing had been seized, and by toll records showing that the 0362 number had repeated contacts with Burley and Judy Curran. Appx1152-58. Second, the court gave a curative instruction, as Curran requested. Appx1472-77. And third, Green's and Fields's powerful and uncontradicted testimony about Curran's admissions stood completely independent of the 0362 number. Appx532-42, 974-77.

Conclusorily, Curran complains that the "curative effect [of the instruction] was limited to begin with." Br.59. If so, Curran only has himself to blame. Curran did not object, either when the district court previewed the instruction that it proposed to read, or when it instructed the jury consistent with its preview. Compare Appx1474-77 with United States v. Pungitore, 910 F.2d 1084, 1128 (3d Cir. 1990). In fact, the court told the jury to disregard the prosecutor's misstatement, which was more than defense counsel requested. Appx1474-75. It also told the jury, twice, that "what is said in closing arguments is not evidence." Appx378, 1425. Presumably, the jury obeyed all of these instructions. United States v. Davis, No.20-3325, 2024 WL 1596669, at **1-2 (3d Cir. Apr. 12, 2024) (citing Sussman). So the curative instruction is assumed to have done its job. Robinson, 2024 WL 1007448, at *3 (finding that, where the prosecutor mistakenly stated in closing that the defendant distributed a business card in promoting the charged prostitution business, the court's instruction that there was "no testimony about what [he] handed out" cured any prejudice, notwithstanding that the instruction came after the jury asked to see the card during deliberations).

*C. Curran Voiced No Objection to the Prosecutor's Third Remark, Which was Proper and did not Plainly Undo the Effect of the Curative Instruction Given After the Second Remark.*

Finally, Curran argues that a third remark the prosecutor made, this time in rebuttal, undid the curative instruction that the district court gave for the second remark. Br.56-59. Though Curran minimizes his own discussion of the 0362 number during his own argument as "passing," Br.56, he said more. After accusing the prosecution of using "games and sleight of hand to try and prove their case," Curran's counsel said: "They've also tried to say that this number was connected to Noah Landfried. There was no testimony about that at all. The closest we got was that it showed up on [Curran's] TruView as 'Lil, Bro,' a nickname that we never heard [Curran] use for Noah." See Appx1549. The prosecutor responded:

> Now, to clarify, as I indicated, the government is not perfect. I'm certainly not perfect. And I did misspeak. The judge informed you that those records related to the phone connection between Noah Landfried and Judy Curran, which is a good thing the defense counsel caught that, because it allows me to also explain to you that the testimony that you heard was that there were numerous phones in the 4Runner, about 15 of them. That was eight months after those phone records. That phone was just another one of the many that Noah Landfried had. Additionally, as it relates to that phone, that was also the phone that had DaShawn Burley, Omari Patton, his son's phone number scattered all through it.

See Appx1562-63. But unlike the first two remarks, Curran did *not* object to this third remark. Id.

Consequently, Curran must show that the court plainly erred in failing to strike this rebuttal *sua sponte*. Welshans, 892 F.3d at 573. Curran must show an error which was "plain or obvious, and affected the fairness, integrity or public reputation of judicial proceedings." See Fulton, 837 F.3d at 307 &

nn.192-93 (cleaned up). Even then, reversal is unwarranted unless Curran demonstrates that the error was "egregious" and that leaving it uncorrected will cause "a manifest miscarriage of justice." Id. at 307 & n.194. This standard is demanding even in prosecutorial-misconduct cases. Young, 470 U.S. at 16-17.

Curran has shown no error, much less a plain one. For starters, Curran's statements about the 0362 number during his own argument were misleading. Testimony about toll records and Curran's "Lil, Bro" TruView association *did* connect the 0362 number to Noah. Appx1152-58. And while no one heard Curran use that nickname for Noah, the testimony of Noah's longtime associate (Evans) confirmed Noah *was* called "Little Bro," Appx908: a moniker that Curran, an even-longer friend of Noah's, Appx536, 920, surely knew. Defense counsel's misstatements are grist for rebuttal. Werts v. Vaughn, 228 F.3d 178, 200 (3d Cir. 2000). Read in context, the thrust of the prosecutor's rebuttal comment was that, given the connections between the 0362 *number* and Noah via Curran's TruView and the toll records, Noah must have had a physical device associated with that number at some point, even though it was not among those found in the wreckage of the 4Runner many months later. Appx1562-63. That was a fair inference to ask the jury to draw. See, e.g., United States v. Parker, No.21-3078, 2023 WL 4117474, at *4 (3d Cir. June 22, 2023) (finding no plain error when prosecutor argued in rebuttal that the defendant "had the phone with the informant's phone number," despite "no direct evidence" of this, where the defendant's responsiveness whenever the informant called the number permitted the inference that the defendant had the phone).

Primarily, Curran argues that the prosecutor's third remark "frustrated the purpose of the limiting instruction given after the second comment, if not

46

undoing its ameliorative effect altogether." Br.56-57. Had Curran thought so, surely he would have objected: yet he did not. Appx1563. Regardless, there is no reason to think he is right: much less *plainly* so. The prosecutor did not repeat her misstatement that the phone associated with the 0362 number was recovered from the 4Runner. At worst, the third remark is ambiguous. But because rebuttal involves improvisation by prosecutors, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974). And a mere ambiguity cannot fulfill Curran's duty to show an error that is *plain*. See United States v. Pavulak, 700 F.3d 651, 667-68 (3d Cir. 2012).

In the end, the prosecutor made one misstatement, not three. She owned up to her mistake. The district court read a curative instruction. While Curran now maintains that those comments warrant a new trial, Br.59, he never moved for a mistrial. That omission "ends the matter." United States v. Stiso, 708 F. App'x 749, 759 (3d Cir. 2017). Curran has not even argued, much less demonstrated, that the court plainly erred in failing to declare a mistrial *sua sponte*. United States v. Riley, 621 F.3d 312, 338-39 (3d Cir. 2010). During deliberations, the jury's only question reflected its laser-focus on Green's testimony. Appx1576. Curran's admissions to Green, Appx532-42, and his similar comments to Fields, Appx974-77, proved his guilt overwhelmingly. Considering that testimony and the evidence corroborating it, there is no reason to suppose that any confusion about the fate of the physical device associated with the 0362 number skewed the verdict. So any error was harmless. Zehrbach, 47 F.3d at 1264-65.

## **CONCLUSION**

Respectfully, the judgment of conviction must be affirmed.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*/s/ Donovan Cocas*
DONOVAN COCAS
Assistant United States Attorney

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains ***12,997*** words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the type face requirement of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in proportional typeface using Microsoft Word 2010 in Times Roman 14-point font.

3.   The text of this e-brief and the hard copies of it are identical.

4.   A virus check was performed on this e-brief with McAfee EndPoint Security.

<u>*/s/ Donovan Cocas*</u>
DONOVAN COCAS
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that the following is a filing user and will be served electronically by the Notice of Docketing Activity. A hard copy of this brief was mailed to:

Michael Ovens, Esq.
The Law Office of Michael Ovens
220 Grant Street, Suite 302
Pittsburgh, PA 15219
*Attorney for Appellant David Curran*

*/s/ Donovan Cocas*
DONOVAN COCAS
Assistant U.S. Attorney

Dated: April 29, 2024